[No. 47189.   En Banc.   November 26, 1980.]

SEATTLE BUILDING AND CONSTRUCTION TRADES COUNCIL,
ET AL, *Respondents,* v. THE CITY OF
SEATTLE, ET AL, *Appellants.*

*Douglas N. Jewett, City Attorney,* and *Philip Mortenson* and *Jorgen G. Bader, Assistants,* for appellants.

*Davis, Wright, Todd, Riese & Jones,* by *Richard A. Derham* and *Neil H. Schickner,* for respondents.

*Kelby D. Fletcher,* amicus curiae.

ROSELLINI, J.—We have before us Initiative 21, a measure which seeks to nullify past acts of the Mayor and City Council of Seattle with respect to the improvement of Interstate 90. It would prohibit expansion of highway facilities on Lake Washington for the accommodation of privately owned motor vehicles. The text of this proposed initiative is set forth below.[1]

Interstate 90 is a component of the national system of interstate and defense highways. In the vicinity of Lake

---

[1] "Section 1. The people find and declare that the construction of additional lanes of highway for private motor vehicle traffic across Lake Washington will:

"(a) worsen an already serious gasoline shortage,

"(b) consume nearly all regional transportation funding for the foreseeable future,

"(c) substantially increase noise and air pollution,

"(d) divide and destroy city neighborhoods,

"(e) aggravate parking problems and traffic congestion,

"(f) harm city parks and recreation areas,

"(g) undermine the rational development of downtown Seattle,

"(h) cause severe disruption during many years of construction.

Washington, it extends from Bellevue across Mercer Island and the Lake Washington floating bridge to an interchange with Interstate 5. The highway is financed exclusively by

"Other types of transportation improvements in the Seattle area would benefit the community. The People of the City of Seattle therefore adopt this ordinance to protect their health and welfare.

"Section 2. (a) It is hereby declared to be the policy of the City of Seattle to encourage the development, improvement and enlargement of public transportation. It is further declared to be the policy of the City of Seattle that public funds currently or to be authorized for the construction of additional lanes of highway across Lake Washington for private motor vehicles be used instead for safety improvements on existing structures and development and improvement of public transportation in the Seattle area. Specifically, it is the policy of the City of Seattle to withdraw and substitute Interstate 90 funds pursuant to Title 23, Section 103(e)(4), United States Code, as amended.

"(b) From and after the date upon which this ordinance becomes effective, the City of Seattle shall no longer be party to a Memorandum Agreement dated 21 December 1976 and signed by the City of Seattle. Any such Memorandum shall be considered, as to the City of Seattle, to be null, void and of no force and effect.

"Section 3. No new bridge nor the expansion of any existing bridge to accommodate increased private motor vehicle traffic shall be constructed across Lake Washington within the city limits of the City of Seattle. The construction of any limited access facility, or any segment thereof, beginning at a junction with existing State Route 5 and located easterly to a junction with or adjoining State Route 90 or to a junction with or adjoining State Route 520, shall be prohibited in the City of Seattle if such facility accommodates or tends to accommodate increased private motor vehicle traffic. The effects of construction or expansion of any such bridge or limited access facility or segment thereof in the City of Seattle, enumerated in section 1 of this ordinance, are declared to be public nuisances and detrimental to the health and welfare of the People of the City of Seattle.

"Section 4. The City of Seattle shall not modify, alter or vacate any street, alley, sidewalk or other public right of way to accommodate or facilitate construction of any highway which may directly or indirectly result in or contribute to the expansion of private motor vehicle capacity of State Route 90 or State Route 520 within the city limits of the City of Seattle. All petitions of King County, the State of Washington, the United States, or any agency or instrumentality thereof, requesting modification, alteration or vacation of any street, alley, sidewalk or other public right of way for such purposes shall be denied.

"Section 5. The City of Seattle shall grant no permit, license or approval which may directly or indirectly result in or contribute to the expansion of the private motor vehicle carrying capacity of State Route 90 or State Route 520 within the city limits of the City of Seattle.

"Section 6. It is the intention of the People of the City of Seattle that the Mayor, City Council, employees and public officials of the City of Seattle shall consider the provisions of this ordinance as essential to the health, safety and peace of the People of the City of Seattle and shall take every action necessary to the implementation of the provisions of this ordinance.

federal and state highway funds, and laws of both entities govern its location and construction.

Engineering and design studies on improvement of the Bellevue–Seattle segment were begun in October 1957 by the Washington Department of Highways (now the Washington Department of Transportation). At about the same time, the Puget Sound Governmental Council, consisting of the counties of King, Kitsap, Pierce and Snohomish (now the Puget Sound Council of Governments) initiated a regional transportation study to develop long–range projections of transportation needs in the Puget Sound area.

By 1971 a "final" design had been formulated, which was the subject of a hearing conducted pursuant to RCW 47.52-.133, .135. In that hearing, as provided by law, representatives of King County and the City of Seattle and other interested persons were given an opportunity to be heard. After the hearing, the Department of Transportation formally adopted its proposed design for the Seattle segment. In December of 1971, the city council filed an objection to the State's plan, as it was permitted to do under RCW 47.52.137, .139, and requested a hearing before a board of review. A board was convened and a hearing was conducted pursuant to RCW 47.52.150–.180. Under RCW 47.52.180, the findings which it made were final and binding on the parties, subject only to modification by stipulation.

Notwithstanding the arbitration of Seattle's dispute with the Department, serious differences of opinion with respect

---

"Section 7. The City Attorney shall defend every action brought to declare invalid any section of this ordinance, and the City Attorney shall maintain all actions to enforce the provisions of this ordinance. Nothing in this section shall prohibit any person from bringing or participating in any action involving the validity or enforcement of the provisions of this ordinance.

"Section 8. Any word or phrase which is used in this ordinance and which is also used or defined in the laws of the State of Washington shall be construed in the same manner and shall have the same definition as is applied in the laws of the State of Washington. The provisions of this ordinance are intended to be remedial and shall be liberally construed to effect the purposes intended.

"Section 9. If any provision of this ordinance or its application to any person or circumstance is held invalid, the remainder of the ordinance, or the application of the provision to other persons or circumstances, is not affected." Initiative 21.

to the design persisted between the various local governments involved. Some of these pertained to the subject of mass transit. Various committees had reviewed the project and studies continued. In 1975, 18 years after the initial study was commenced, the legislature, in a law designed to terminate the debate, prescribed a deadline for local participation in the decision–making process. This law proclaimed it to be the "sense of the legislature" that

> further protracted delay in establishing the transportation system [I–90] is contrary to the interest of the people of this state and can no longer be tolerated as acceptable public administration.

RCW 47.20.645.[2]

RCW 47.20.647 directed the Puget Sound Council of Governments to complete its study by November 1, 1975, and required the city councils of Seattle, Mercer Island, and Bellevue, and the county council of King County to either approve by resolution or disapprove a request to withdraw the disputed segment from the interstate system.

Under that section, if three of the four local governments approved the request, and the Governor and Puget Sound Council concurred in that request, no further funds from the motor vehicle fund would be spent to develop the segment as an interstate highway without further express authorization of the legislature. If fewer than three of the four local governments requested withdrawal or if the Governor did not concur in the withdrawal request, no tax revenues collected by the State should be spent on substitute mass transit projects in the Seattle metropolitan area

---

[2]This statement was inspired by legislative findings that studies had been made by a multi–disciplinary design team which had solicited the broadest public participation; that the proposed facility had been the subject of numerous lawsuits and administrative proceedings which have prevented advancement of the project to construction; that the cost of construction had increased at that time by more than $100,000,000; that the traffic congestion and hazards in the existing corridor were no longer tolerable; and that after 18 years the public interest required that prompt and final decisions be made.

pursuant to 23 U.S.C. § 103(e)(4), without further express authorization of the legislature.[3]

Pursuant to these provisions, the four local governments passed resolutions favoring continuation of the Interstate 90 project, and the Department promptly completed the public hearings required.

Meanwhile, negotiations continued in an effort to resolve the remaining disagreements between the local governments with respect to design. These culminated in a memorandum agreement entered into by the four local governments, the Municipality of Metropolitan Seattle, and the Washington State Highway Commission in December 1976. In 1977, the legislature amended RCW 47.52.180 to provide that any modification of the proposed plan by the board of review might thereafter be further modified by a stipulation of the parties. Laws of 1977, ch. 77, § 3, p. 152.

With the adoption of the memorandum agreement, the design had apparently been finally determined. Then, in 1980, Initiative 21 was circulated by a group of Seattle citizens opposed to that design. The necessary signatures were obtained, and the city comptroller transmitted the measure to the city council, which passed an ordinance submitting the initiative to the voters at a special election to be held in conjunction with the state general election on November 4, 1980.

This action for declaratory and injunctive relief was filed in May. The Superior Court granted the plaintiff's motion for summary judgment, holding that the proposal was not within the initiative power.

We are in agreement with that conclusion.

■ It is the general policy of this court to refrain from inquiring into the validity of a proposed law, including an initiative or referendum, before it has been enacted. *See State ex rel. O'Connell v. Kramer,* 73 Wn.2d 85, 436 P.2d 786 (1968); *State ex rel. Griffiths v. Superior Court,* 92

---

[3]This provision makes allowance for further express authorization of withdrawal and substitution requests by state and local governments acting jointly.

Wash. 44, 159 P. 101 (1916). Courts offer a number of reasons for this rule, among them that the courts should not interfere in the electoral and legislative processes, and that the courts should not render advisory opinions. *See* Annot., *Injunctive Relief Against Submission of Constitutional Amendment, Statute, Municipal Charter, or Municipal Ordinance, on Ground That Proposed Action Would Be Unconstitutional,* 19 A.L.R.2d 519, at 523 (1951). However, the courts will take cognizance of certain objections to an initiative measure, and one of these is that the proposed law is beyond the scope of the initiative power. *Leonard v. Bothell,* 87 Wn.2d 847, 557 P.2d 1306 (1976) (the corporate entity may not exercise power delegated to its governing body and may not exercise administrative powers); *Ruano v. Spellman,* 81 Wn.2d 820, 505 P.2d 447 (1973) (the initiative may not be used to effect matters which are administrative rather than legislative in character); *State ex rel. Guthrie v. Richland,* 80 Wn.2d 382, 494 P.2d 990 (1972) (an ordinance implementing the power given by statute to city officials not subject to referendum); *Ford v. Logan,* 79 Wn.2d 147, 483 P.2d 1247 (1971) (initiative power cannot be employed to repeal a municipal charter); *State ex rel. Haas v. Pomeroy,* 50 Wn.2d 23, 308 P.2d 684 (1957) (the referendum held not available where the power to issue bonds and change rates was lodged in corporate authorities); *Amalgamated Transit Union–Div. 757 v. Yerkovich,* 24 Ore. App. 221, 545 P.2d 1401 (1976) (an initiative may not propose administrative action); *Bagley v. Manhattan Beach,* 18 Cal. 3d 22, 553 P.2d 1140, 132 Cal. Rptr. 668 (1976) (where a power was not within those granted to a city by statute, it could not be created by initiative); *State ex rel. Barberis v. Bay Village,* 281 N.E.2d 209 (Ohio C.P. Cuyahoga County, 1971) (where the only action of a local governing body is the exercise of authority, delegated to it under state or federal statute, to approve or disapprove local implementation of that statute, the action is administrative and not subject to referendum).

■ While the inhabitants of a municipality may enact legislation governing local affairs, they cannot enact legislation which conflicts with state law. Const. art. 11, § 10, authorizes municipal charters "consistent with and subject to the Constitution and laws of this state". Professor Philip A. Trautman aptly states in 38 Wash. L. Rev. 743 (1963):

> The fundamental proposition which underlies the powers of municipal corporations is the subordination of such bodies to the supremacy of the legislature.

Interstate 90 is designated as a state route in RCW 47.17.140. As a limited access facility, its title is vested in the State, which has full jurisdiction, responsibility and control over it. RCW 47.24.020(2). The State has the right to acquire any lands it needs for highway purposes from any municipality. RCW 47.12.040. *See also* RCW 47.52.027.

While the governing body and the people of Seattle have a voice in determining the kind of facility, if any, which will be constructed in the Interstate 90 corridor, their participation is governed by statute. The statutes which we have referred to earlier reveal the extent to which local governments and the citizens of municipalities can participate in that decision–making process.

■ RCW 47.52 provides the exclusive method under state law for determining whether a limited access route will be built, and, if so, where it will be located. There is provision for a design hearing, at which members of the public may voice their objections. RCW 47.52.135. If a county, city or town disapproves of a plan proposed by the state highway authority, it may, in writing, file that disapproval with the Secretary of Transportation, and request a hearing before a board of review. RCW 47.52.139. Local governments have a voice equal to that of the Secretary in selecting the members of the board of review. RCW 47.52-.150. After a hearing at which all parties are allowed to present evidence, the board renders its final and binding decision, subject to revision only by stipulation of the parties.

This procedure was followed with respect to Interstate 90 and the decision of the board was later modified by the memorandum agreement to which the City and the Washington Highway Commission were parties. The decision of the board, as well as the memorandum agreement, approved the design of the highway as a limited access facility with provision for mass transit.

The other significant act of the government of Seattle was the adoption of a resolution favoring continuation of the Interstate 90 project.

■■ The obvious intent and thrust of Initiative 21, as the Superior Court noted, is to forbid continuation of that project and all other limited access facilities which might be proposed across Lake Washington. This it is not within the power of the City to do. As between state and local governments, the State has plenary control over its limited access facilities, and local governments have only those rights and powers which the legislature has seen fit to accord them. Those rights and powers are administrative in nature, rather than legislative.

In drawing a distinction between matters which are legislative and those which are administrative, this court has said, adopting the tests set forth in 5 E. McQuillin, *Municipal Corporations* § 16.55 (3d rev. ed. 1969), at pages 213–14:

> Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative. . . .
>
> The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has further been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.

(Footnotes omitted.)

All of the acts which the statutes relating to limited access facilities authorize local governments or their officials to perform are temporary and special in character, constituting their participation in the process of accepting or rejecting a proposed facility. They are done in the pursuit or implementation of laws passed by the legislature.

It is true that the initiative purports to establish a policy and prescribe rules for future actions of city officials. But the difficulty is that these relate to matters upon which the City has no authority to legislate—namely, the location and construction of state limited access facilities. The City cannot ban the construction of such facilities, nor can it rightly refuse to cooperate with the State in such construction, once a plan has been adopted. In substance, the proposal is an attempt to reverse administrative decisions of city officials and dictate the future course of such decisions. As such it is invalid.

While a resolution or ordinance establishing a rigid policy in one community is not expressly forbidden under the relevant state laws, it hampers the exercise of administrative discretion conferred by such statutes; and the resulting conflict with state law places it beyond the initiative power.

Amicus curiae advances the proposition that RCW 47.20-.645 *et seq.* is in conflict with federal law, namely, 23 U.S.C. § 103(e)(4), and is therefore invalid. That section provides:

> Upon the joint request of a State Governor and the local governments concerned, the Secretary may withdraw his approval of any route or portion thereof on the Interstate System which is within an urbanized area or which passes through and connects urbanized areas within a State and which was selected and approved in accordance with this title, if he determines that such route or portion thereof is not essential to completion of a unified and connected Interstate System and if he receives assurances that the State does not intend to construct a toll road in the traffic corridor which would be served by the route or portion thereof.

■ The theory of amicus is that the state statutes obstruct the right of the City to initiate and/or participate

in such a request for withdrawal and substitution. Assuming that there is a conflict between these provisions, and that with respect to the subject matter, federal laws prevail over state laws, those conclusions do not operate to expand the scope of the initiative power. Section 103 contemplates the participation of local governing bodies, not the local electorate, and properly so, since the acts involved are administrative in nature rather than legislative. Since powers delegated to the governing body of a municipality may not be exercised by the electorate, and the scope of the initiative power is confined to the enactment of legislation, the provisions relied upon in section 103 of the federal act do not validate the initiative.

The judgment is affirmed.

UTTER, C.J., and STAFFORD, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.