YUTE AIR ALASKA, INC., et al., Appellants,

v.

Stephen A. McALPINE, Lieutenant Governor of the State of Alaska, et al., Appellees.

No. S–548.

Supreme Court of Alaska.

April 19, 1985.

**1174**

Avrum M. Gross and Susan A. Burke, Gross & Burke, Juneau, for appellants.

James L. Baldwin, Asst. Atty. Gen., Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

Before BURKE, C.J., and RABINOW-ITZ, MATTHEWS, COMPTON and MOORE, JJ.

OPINION

PER CURIAM.

I.

 We set out in full the Memorandum Decision of the superior court which explains the questions presented and, in our view, properly resolves them:

"MEMORANDUM DECISION

"I. *Introduction.*

"The defendants (McAlpine) have decided to place an initiative proposition on the November 1984 general election ballot which will repeal statutes regulating motor and air carriers in Alaska, open the carrier business to any and all financially responsible persons, prohibit municipalities from regulating these activities, and require the governor to seek repeal of the federal statute (the Jones Act) which requires the use of United States vessels for shipping goods between United States ports. The initiative proposition is entitled, "Reducing Government Regulation of Transportation." The initiative is a project of the Alaska Libertarian Party for 1984. Stipulation No. 1.

"The plaintiffs (Yute Air),[1] all of which are regulatees under the state laws to be repealed and apparently not ready for free enterprise in 1984, seek to prevent the proposition from being on the ballot, either permanently on grounds of invalidity or at least until the first statewide election following the next convening and adjourning of a session of the Alaska Legislature. The raise the following issues:

"1. The initiative violates the single-subject rule.

"2. The constitution implicitly requires that the signatures in support of the initiative be verified before the legislature both convenes and adjourns in order for it to be submitted to the voters.

"II. *The Single-Subject Rule.*[2]

"Yute Air's argument here divides into two parts. The first is the traditional one: The initiative acts both on the deregulation of Alaska's intra-state air and motor carriers and on the federally regulated, interstate sea carriers, that is, on two subjects. After the decision in *State v. First Nat'l Bank of Anchorage,* 660 P.2d 406 (Alaska 1982), it is difficult to sustain that argument. Suffice to say, that even if the court went too far in that case and were inclined—although there is no sign of if—to step back from that decision, the initiative here does not embrace two, unrelated subjects. Indeed, the economic effects of these two sources of regulation over transportation of freight in and to Alaska may well be perceived by deregulators as one of this state's most serious problems. The two sources of regulation are, from that viewpoint, inextricably related, certainly far more integrated and related than boat harbors and flood control projects or than trooper facilities and new and improved prisons.

"Nor should it matter that the repeal of the federal law and the repeal of the state laws do not interact or interrelate legally with another. To the miner at Minto who wants to bring his supplies from Seattle, the interaction and interrelation is more than just self-evident—it is glaringly so. While one could address the existing laws in two or three bills, it is rational to address all of them together.

"The second part of Yute Air's single-subject argument is more interesting. It argues that the provisions of the initiative which require the governor to seek the repeal of the Jones Act[3] are not law but rather a plebicite directing administrative activities, and therefore, not a proper subject for an initiative under the Alaska Constitution which limits the use of the initiative to the enactment of laws. Alaska Const., art. XI, § 1. It cites *Seattle Building Construction Trades Council v. City of Seattle,* [94 Wash.2d 740], 620 P.2d 82 (Wash.1980), as an example of the case law in support of its point.

"*Seattle Building* is one of a line of cases, all or almost all of which limit the use of municipal initiatives, in which the

courts attempt to draw a line between laws and administrative acts. The cases usually involve municipalities because, unlike state governments in which the three great powers are separated, local governing bodies are generally vested with an admixture of both legislative and administrative powers. City councils, county commissioners, and borough assemblies not only enact laws but they also administer them to a very great extent and they also sit as boards of review, exercising quasi-judicial powers at times and making fundamental executive policy at other times. Where the city or county voters seek to exercise these latter kinds of powers through the initiative, so the theory goes, they exceed the law making power vested in them under initiative provisions.

"A close reading of the cases finds many of them to be analytically defective. Laws frequently reverse prior administrative decisions and set new policies for administrators to follow. There is nothing legally wrong with that. Indeed, it is precisely policy which law is intended to set, and the executive is bound under the constitution to carry out that policy. Alaska Const., art. III, § 16.

"Nothing in the constitution of this state limits the legislature's power to enact laws establishing as this state's policy a change in existing federal law. Indeed, the Alaska Territorial Legislature, a creature of very limited power under federal law and control, by law established an Alaska Statehood Committee to do just that, that is, to make Alaska a state rather than a territory. Chapter 108, SLA 1949. And it is (was?) common knowledge that one of the most vexing drawbacks of territorial status perceived by statehood promoters was the very Jones Act which the legislation here would have the governor seek to repeal. It would certainly come as a surprise to the framers of the Alaska Constitution that they had somehow prohibited direct legislation on that subject.

"Analytically, laws may be enacted on any subject under the sun: They can command the tides to stand still for King Ca-' nute or the mountain to come to Mohammed. That they may or may not be effective is of no moment. It will hardly do to say that a law may not be enacted because it is silly—not at least at this late date. Only if one can point to some prohibition expressed or implied in the state or federal constitutions can it be said that some proposed law would violate the constitution and may not, therefore, be the subject of an initiative. Yute Air argues only that the provisions of the initiative relating to the Jones Act are not 'law.' That argument is simply not correct. Those provisions establish a public policy and they make it the chief executive's duty to carry that policy out. They are a solemn expression of legislative will, and that is what law is all about. Black's Law Dictionary 1074 (3rd ed. 1933). It is presumed that the chief magistrate will carry out that law, and this court will not entertain any argument to the contrary.

"Yute Air also argues, however, that the state's *law making* power does not include the law maker's directing the executive (or the judiciary) with respect to the relationship between the State of Alaska and the United States. In other words, the legislature or the people may, by law, establish public policy on all subjects which are within their jurisdiction under the constitution. But when they step outside their jurisdiction—here to seek repeal of a federal law on maritime shipping—they have no power to make law on the subject and may not purport to use the law making power to proclaim public policy on the subject. Stated another way, the law makers may, within their jurisdiction, establish public policy which must be followed by the executive and the judiciary. But where, as here the subject matter is outside their jurisdiction, the law making power may not be invoked.

"It follows under this view that the law makers may themselves lobby the Congress or send it resolutions but that in doing so they are not exercising the law making power. While the legislature's enacting a law on the subject could not be subjected to judicial restraint, the use of

the initiative is subject to judicial oversight and restraint if it exceeds the bounds authorized by the constitution. *Boucher v. Engstrom*, 528 P.2d 456 ([Alaska] 1974). Where, as here, so they (sic) theory goes, the initiative is used not as an exercise of the law making power but rather as a directive outside the jurisdiction of the law makers, it should be enjoined.

"The problem with this argument is that the legislature frequently enacts laws prescribing the conduct of officials or agencies of state government on matters over which the state has no legal jurisdiction. For example, the State Geographic Board is established by law in the office of the Governor, AS 44.19.054, to—among other things—serve as state representatives on the United States Geographical Board and cooperate with that board to avoid conflicts of state and federal designations of geographical features in the state. Obviously, the state's law making power does not extend to those federal designations, but state officials can influence them. The Alaska International Development Commission in the Office of the Governor is to prepare a plan for joint development and use of the resources of the upper Yukon River (in Canada) and cooperate with Canadian and United States agencies for resource development near the Alaska-Canada border. AS 44.19.064. The Alaska State Office in Tokyo promotes trade between Alaska and the Far East. AS 44.19.-074. The Yukon-Taiya Commission studies, compiles and publishes information, and promotes development of the international Yukon-Taiya Hydroelectric project. AS 44.19.181.

"The most apt example is the Steering Council for Alaska Lands. AS 38.95.100–140. The inter-branch council was established in 1977 to 'develop a unified lobbying and informational effort' on Alaska lands legislation then being considered by Congress. Of course, the law assigned the counsel (sic) other functions—as does section 4 here—but its principal purpose was to lobby Congress on ANILCA.

"Presumably, under section 4 of the proposed initiative, the governor would delegate to the personnel of the Alaska office in Washington, D.C. the additional function of persuading Congress to repeal the Jones Act and compile information and publish an annual report on the Act's effects and their progress (or lack thereof) in getting it repealed. It would not make section 4 any more of an exercise in making law if it provided for a commission or council to promote the repeal of the Jones Act and report annually on its efforts.

"It seems to this court that section 4 does not usurp the executive's powers, is not the exercise of an executive or quasi-judicial function, and is not an exercise of power barred to the law makers by the constitution. Accordingly, it is valid.

"III. *1984.*

"Yute Air argues that, even if the initiative survives their single-subject challenge, it may not be placed on the ballot in 1984. It reasons that, under Article XI, section 4, of the Alaska Constitution, the initiative is to be voted on at 'the first statewide election held more than one hundred twenty days after adjournment of the legislative session following the filing [of the initiative].' This 'filing,' it argues, must be read consistently with the requirements of Article XI, section 3, of the constitution that the initiative petition must be signed by a prescribed number of 'qualified voters' before 'it may be filed with the lieutenant governor.' From this, it argues that the signatures must be verified, that is, the voter's qualifications ascertained, before the petition may be deemed to be 'filed' for purposes of calculating the proper election at which the initiative should be submitted to the voters.

"Yute Air buttresses its argument with the provisions of the Election Code which provide for verification within a prescribed period (sixty days), AS 15.45.150, provide the basis for determining impropriety with respect to subscribers, AS 15.45.160, provide for supplementary petitions to cure the improprieties, AS 15.45.170, provide for ballot preparation, AS 15.45.180, and pro-

vide for the initiative to go on the ballot at the first statewide election held 120 days after the adjournment of the legislature which convened after the petition and any supplementary petition were 'filed.' AS 15.45.190.

"It argues that the meaning of these interlocking provisions cannot be doubted, that the statutory provisions are clearly not in conflict with the constitution but rather contemplated by it. Alaska Const., Art. XI, § 6, and Vol. 4 Minutes Alaska Const. Conv. 2965–2967 (1955), and that they clearly illustrate how for purposes of determining when to place an initiative on the ballot, verification is a prerequisite for a petition's being 'properly filed.' AS 15.45.180.

"McAlpine argues that there is a long-standing contemporaneous construction of these constitutional and statutory provisions which is contrary to the carriers' interpretation. However, the carriers' reply to that argument must prevail. There simply has been no consistent construction of the constitution or the statute on the issue raised here; indeed, the precise issue has never been raised before.

"The question here is close. The logic of the decision in *Kays v. McCall*, [244 Or. 361], 418 P.[2d]1d 511, 514 (1966), is highly persuasive and makes excellent sense, and those possessing the power to make law may well wish to consider it. But this court's role is not to amend the constitution or the statute but rather to interpret them, and it seems clear that neither contemplates the result sought by Yute Air.

"Under the Election Code, McAlpine was to place the initiative on the ballot '[i]f it is properly filed.' AS 15.45.180. He had sixty days after it was filed in which to make that determination. AS 15.45.150. The question goes on the ballot after the first statewide election held after

"(1) the petition and any supplementary petition have been filed, (2) a legislative session has convened or adjourned, and (3) a period of 120 days has expired since the adjournment of the legislative session.

"AS 15.45.190. It seems obvious that the framers contemplated the need to verify signatures. Vol. 4, Minutes Alaska Const. Conv. 2966 (1955). But nothing in the constitution says or implies that the verification process tolls the time in which the initiative is to be considered by the legislature and proceeds onto the ballot (or is voided by legislative enactment of substantially the same measure).

"Similarly, the statutory provisions neither express nor imply any tolling of the time. The legislature used the terms 'file,' 'filed,' 'properly or improperly filed,' 'properly filed,' and 'filing' at various places throughout sections 140 through 190 of chapter 45, title 15, relating to the initiative petition. Each of the differing uses denoted a particular meaning appropriate to the use. The unmodified term 'filed' is used in section 190 (placing proposition on ballot). Had the legislature contemplated the meaning attributed to the term by Yute Air, it is more likely than not that a more precise term would have been used by it. Indeed, it is most unlikely, given the precision in the legislature's use of these terms, that— had Yute Air's meaning been intended—the unmodified term would have been used. It is much more likely that the legislature would have added appropriate language to section 190, for example, the underlined words in the following: '(1) the petition and any supplementary petition have been *reviewed and determined to have been properly* filed.'

"The Alaska Constitution and the Election Code, prior to the amendments made to some of their provisions, were unusually well drafted, each with its own interlocking parts and with terms carefully chosen and consistently used to denote specific things. Their respective authors generally followed the first rule of statutory drafting: Say what you mean and mean what you say. The constitution and the code do not *say* (or fairly imply) what Yute Air says they mean, and therein lies the fatal flaw in Yute Air's argument.

"Yute Air's argument is, however, more subtle: It may be ready to assume that

neither the framers nor the legislature really contemplated the necessary effect of requiring verification. Thus, it is immaterial that the *language* of article XI and of title 15, chapter 45, neither says nor fairly implies that the subscribing signatures must be verified as those of qualified voters *before* the initiative can be deemed to have been properly filed. The constitution clearly requires that an initiative petition must be signed by the specified number of qualified voters before it may be filed. It also requires that, before the initiative may be submitted to the voters, it must be filed, then a legislative session must be convened and adjourned, and then one hundred twenty days must pass. Thus, to give full effect to the provision requiring an initiative to lie before the legislature for a complete session after it is filed, its verification must perforce occur before the session convenes.

"The argument overlooks the obvious. Both logically and as a matter of practical experience, the legislature does not need an initiative petition to be verified before it considers the same subject. It suffices for all practical purposes that a facially valid initiative be filed. (This is not to say that the legislature could not require verification in advance for the sake of greater certainty.)

"On January 16, 1974, two related initiative petitions were filed with the lieutenant governor, one on conflict of interest, the other on campaign disclosure. The former was certified on March 1, 1974, and the latter on March 20, 1974. The legislature, which adjourned on April 26, 1974, considered both subjects, did not enact legislation on conflict of interest but enacted legislation, chapter 76, SLA 1974, on campaign disclosures. It was held to be substantially the same, thereby voiding that initiative. *Warren v. Boucher*, 543 P.2d 731 (Alaska 1975). The conflict of interest initiative was adopted by the voters on August 27, 1974. The 1975 legislature convened on January 20 and passed a bill to amend the latter initiative as one of its first orders of business. Chapter 2, SLA 1975. It became effective on February 8, 1975. *Warren v. Thomas*, 568 P.2d 400 (Alaska 1977).

"The two *Warren* cases establish the proposition that the provisions of section 6 of article XI on amendment of adopted initiatives and on voiding pending initiatives vest the legislature with broad powers to protect the state against the untoward effects of initiatives. *Warren v. Thomas*, *id.*, at 402, n. 7. More importantly, they illustrate more convincingly than any a fortiori argument that verification of an initiative petition before the legislature convenes is not a prerequisite for the legislature's invoking those powers.

"While the court in no way disagrees with the importance of the safeguard afforded by requiring the initiative to lie before a complete session of the legislature, it concludes on the basis of the language of the constitution and the election code and on the basis of experience that actual filing of a facially valid initiative suffices to invoke that safeguard. Certainly, the legislature is at least as capable as this or any court of apprehending and appraising the priority which should be assigned to the many matters brought before it. Had it considered this matter to be important enough it could have stayed in session to deal with it. Here, the legislature chose not to act. It would be idle to speculate why. Suffice to say that the legislature may call itself, or be called, into special session to act on the matter, or if the initiative is adopted by the voters, act to amend it at its next regular session.

"Accordingly, summary judgment is granted for the defendants.

---

"1. Plaintiffs are named in reverse alphabetical order, with Yute Air Alaska, Inc. leading off and Alaska Airlines and the Alaska Trucking Association, Inc., closing.

"2. Article II, Section 13, of the Alaska Constitution requires that "[e]very bill shall be confined to one subject...." The same restriction is enacted at AS 15.45.040 with respect to initiatives. Whether this limitation is within the legislature's power under Article XI is questionable. But Article XII, Section 11, makes the law making power equal, and the Article II restriction, therefore, applies to initiatives.

"3. Section 4 of the Initiative reads:

"Sec. 44.19.035. JONES ACT REPEAL. The governor shall use best efforts and all appropri-

ate means to persuade the United States Congress to repeal 46 U.S.C. secs. 862, et seq., known as the Jones Act. Until that Act is repealed, the governor shall publish an annual report documenting the harmful effects of the Act on Alaska commerce, and progress made towards its repeal. The report shall be submitted to the legislature no later than its convening each year."

## II.

Our colleague, Justice Moore dissents on two grounds: First, that the initiative violates the single subject rule, and second, that the section of the initiative relating to the Jones Act is not a law and thus not a proper subject for an initiative. Our views on these points are accurately reflected in the Memorandum Decision of the superior court. We have the following additional comments.

### A. *Single Subject*

Justice Moore's dissent is primarily directed to the proposition that our cases interpreting the single subject rule have been too deferential to the legislature,[1] that we have construed it with such breadth "as to render the rule meaningless." Dissent at page 1183. In our last decision concerning the single subject rule, *State v. First National Bank of Anchorage*, 660 P.2d 406, 414–15 (Alaska 1982), we expressed similar misgivings. At issue there was whether an act containing disparate sections which were unrelated to each other

except that they all concerned land violated the single subject rule. We stated:

Thus, the issue to be resolved is whether the general heading "land" can be considered "one subject" for purposes of article II, § 13. Were we writing on a clean slate, we would be inclined to find this subject impermissibly broad. Permitting such breadth under the one subject rule could conceivably be misconstrued as a sanction for legislation embracing "the whole body of the law."

*Id.* (citation omitted). However, we concluded based on prior precedents which had found "water resources" and "state taxation" (*see supra* n. 1) to be appropriate vessels for the diverse cargo with which they had been loaded, that " 'land' is not an unduly broad subject for purposes of article II, § 13." *Id.* at 415.

We still have the same reservations which we expressed in *First National Bank*. Three reasons, however, lead us to believe that we should not now overrule our prior cases.

First, it is not at all clear that there are workable stricter standards. Our standard is that the

"act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, ei-

---

**1.** In *Suber v. Alaska State Bond Comm.*, 414 P.2d 546 (Alaska 1966), this court upheld an act which provided mortgage aid to home owners victimized by the 1964 Good Friday Earthquake. The Act was challenged under the single subject rule on the ground that one of its sections provided for criminal sanctions. *Id.* at 556. The court held that the criminal sanctions were "fairly incidental to the general subject expressed" in the Act, and upheld the Act. In *Gellert v. State*, 522 P.2d 1120, 1122–23 (Alaska 1974), this court upheld under the one subject rule a law which provided funding for flood control and boat harbor projects. The court characterized this Act as "part of a cooperative water resources development." *Id.* at 1123. In *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 545–46 (Alaska 1978), this court upheld legislation pertaining to a scheme of state and municipal taxation, stating "State taxation is not an unduly broad category under the one subject rule.... [S]ince all of the provi-

sions of the act relate directly to state taxation we find no violation of the one subject rule." In *Short v. State*, 600 P.2d 20 (Alaska 1979), this court upheld legislation authorizing the bonding of both correctional facilities and public safety administration services. "[I]n our opinion, the 'protection of the public' and 'administration of justice' objectives which are to be served by these correctional facilities are sufficiently related to purposes to be served by the public safety administration buildings to be constitutionally included in the same legislative enactment and bonding proposition." *Id.* at 25. Finally, in *State v. First National Bank of Anchorage*, 660 P.2d 406, 414–15 (Alaska 1982), this court upheld a bill containing a myriad of provisions in some way relating to the general topic of "land." Finding that the issue was "indeed close" the court nevertheless concluded that " 'land' is not an unduly broad subject for the purposes of [the one subject rule]." *Id.* at 415.

ther logically or in popular understanding, as to be parts of, or germane to, one general subject."

*Gellert v. State,* 522 P.2d 1120, 1123, *quoting from Johnson v. Harrison,* 47 Minn. 575, 50 N.W. 923, 924 (1891). This formulation is similar in breadth to those generally adopted by other state courts. *See* Ruud, *No Law Shall Embrace More Than One Subject,* 42 Minn.L.Rev. 389, 393–95 (1958). The only narrower standard of which we are aware is that adopted in Florida relating to that state's one subject rule applicable to initiatives. The Florida rule forbids, among other things, initiatives which direct the function of more than one department of government, such as the legislative and judicial departments. *Evans v. Firestone,* 457 So.2d 1351, 1354 (Fla.1984) ("The proposed amendment now before us affects the function of the legislative and the judicial branches of government.") We do not think that the Florida departmental function rule is an apt one. Many laws embracing a single subject direct more than one governmental department to act. For example, nearly all uniform codes have provisions directing judicial and executive action and thus would have to be passed in separate enactments under the Florida rule. *E.g.,* AS 25.25.010 *et seq.* (Uniform Reciprocal Enforcement of Support Act); AS 32.10.010 *et seq.* (Uniform Limited Partnership Act); AS 45.01.010 *et seq.* (Uniform Commercial Code); AS 47.70.010 *et seq.* (Interstate Compact on the Placement of Children).

Second, the sponsors of the initiative have relied on our precedents in preparing the present proposition and undertaking the considerable expense and time and effort needed to place it on the ballot.[2] This process could not have been started had not the lieutenant governor certified the proposition as in proper form, an act also taken in reliance on our precedents. AS 15.45.070.

■ Third, an initiative is an act of direct democracy guaranteed by our constitution. Because petitions are often prepared by inexpert sponsors who nonetheless espouse worthy or popular causes, or both, courts are reluctant to invalidate them in cases of merely doubtful legality.

In matters of initiative and referendum, we have previously recognized that the people are exercising a power reserved to them by the constitution and the laws of the state, and that the constitutional and statutory provisions under which they proceed should be liberally construed. *Boucher v. Engstrom,* 528 P.2d 456, 462 (Alaska 1974). To that end "all doubts as to all technical deficiencies or failure to comply with the exact letter of procedure will be resolved in favor of the accomplishment of that purpose. *Boucher v. Engstrom, supra,* quoting *Cope v. Toronto,* [8 Utah 2d 255], 332 P.2d 977, 979 (1958).

*Municipality of Anchorage v. Frohne,* 568 P.2d 3, 8 (Alaska 1977) (footnotes omitted). Justice Moore's contention (discussed at dissent at p. 1184–1185) that the single subject requirement should be more strictly applied in the initiative (as opposed to legislative) context not only is adverse to our deferential attitude toward initiatives, it also ignores the explicit constitutional directive to the contrary. Alaska Const. Art. XII, § 11 provides: "Unless clearly inapplicable, the law-making powers assigned to the legislature may be exercised by the people through the initiative...." A one subject rule for initiatives which is more restrictive than the rule for legislative action is not permitted.

■ Justice Moore also argues that our decision in this case does not comport with the single subject standard we have adopted and thus goes further than our precedents. We disagree. The subject "transportation" embraces all sections of the initiative. Our approval of *Gellert, supra,* where the subject was "water re-

---

**2.** The petition must be signed by qualified voters equal to ten percent of those who voted in the last general election. Signatures must come from at least ⅔ of all election districts in the state, and must be obtained within one year. AS 15.45.140. Each signature must be subscribed in the presence of a sponsor of the initiative. AS 15.45.130.

sources," *North Slope Borough, supra,* where the subject was "state taxation," and *First National Bank, supra,* where the subject was "land," suggests that "transportation" is not too broad a subject for the one subject rule. Further, a common thread narrower than "transportation" runs through the initiative. It is that regulations and statutes thought to create needless transportation costs should be eliminated. We were unable to discover any similar uniting theme within the general category of "land" in *First National Bank, supra.* And in *Gellert, supra,* one would be hard pressed to find a relationship other than "water resources" between an interior Alaska flood control project and a coastal small boat harbor. Yet, in both cases the legislation in question was upheld.

### B. *Law or Resolution*

 Justice Moore also contends that section 4 of the initiative relating to the Jones Act is a resolution rather than a law and thus cannot be included in an initiative. Under section 4 of the initiative the governor is required to use his best efforts to persuade Congress to repeal the Jones Act and, until repeal, must each year publish a report detailing the harmful effects of the Act on Alaska commerce and submit it to the legislature.[3] Since section 4 mandates action by the governor it is not a resolution. A resolution is advisory; action can only be required by law. As we stated in *State v. A.L.I.V.E. Voluntary,* 606 P.2d 769, 773 (Alaska 1980):

**3.** The text of the Jones Act portion of the initiative reads as follows:
 The governor shall use best efforts and all appropriate means to persuade the United States Congress to repeal 46 U.S.C. secs. 861, et seq., known as the Jones Act. Until that Act is repealed, the governor shall publish an annual report documenting the harmful effects of the Act on Alaska commerce, and progress made towards its repeal. The report shall be submitted to the legislature no later than its convening each year.

**4.** We also quoted the following:
 A mere resolution ... is not a competent method of expressing the legislative will,

Of course, when the legislature wishes to act in an advisory capacity it may act by resolution. However, when it means to take action having a binding effect on those outside the legislature it may do so only by following the enactment procedures.[4]

The judgment is AFFIRMED.

MOORE, Justice, dissenting.

The majority concludes that the "single-subject" rule is not violated by this initiative's two topics, (1) the repeal of state statutes regulating transportation and (2) the directive to the Governor to "use best efforts" to persuade the U.S. Congress to repeal the federal Jones Act. Additionally, the majority concludes that the Jones Act provision of the initiative enacts a "law" and is thus a proper subject for an initiative under Article XI, § 1 of the Alaska Constitution. I dissent from both of these conclusions.

First, this initiative violates the purposes of the single-subject rule. This court has mistakenly continued to give the rule such an extremely liberal interpretation that the rule has become a farce. Prior decisions tell us that in Alaska any hodgepodge of laws will comply if broadly construed to "relate to" such general topics as water, or land, or taxation. Having made the rule almost meaningless as applied to legislative enactments, this court has extended the same liberal interpretation to the initiative process. In cases to come, what contrived combination of proposed laws, covered by a broad title, would *not* comply with the majority's view of the single-subject "rule"?[1]

 where that expression is to have the force of law, and bind others than the members of the house or houses adopting it.
*State v. A.L.I.V.E.* at 773–774, *quoting Mullan v. State,* 114 Cal. 578, 46 P. 670, 672 (1896). And:
 A concurrent resolution, unlike a statute, is binding only the members and officers of the legislative body.
*State v. A.L.I.V.E.* at 774, *quoting Moran v. La-Guardia,* 270 N.Y. 450, 1 N.E.2d 961, 962 (1936).

**1.** Why not allow the linking of *car*-related laws to (a) require car dealers in Alaska to install airbags in cars sold here; (b) direct the Governor to persuade Congress to make the I.R.S. grant tax breaks to drivers in cold-climate states

Second, the general language of Article XI, § 1 of the Alaska Constitution clearly limits the initiative process to enacting "laws," which in turn are further restricted by the specific provisions of Article XI, § 7. Part of the proposed initiative presents a mere resolution that does not qualify as a proposed *law* and should at least be severed from the rest of the initiative. The drafters of the initiative apparently foresaw this possibility and specifically provided that these independent provisions were severable. At the very least, this initiative's two distinct provisions should be severed and presented on the ballot as two independent proposals, one to effectively eliminate certain state transportation regulations, and the other to express a desire for federal repeal of the Jones Act.

## I.

Turning first to the majority's main conclusion, I cannot agree that this initiative's two topics can be said to "fairly relate" to the same subject.[2]

In *Suber v. Alaska State Bond Committee*, 414 P.2d 546 (Alaska 1966), this court stated that:

> The purpose of the constitutional requirement that every bill be confined to one subject ... is to prevent the inclusion of incongruous and unrelated matters in the same bill in order to get support for it which the several subjects might not sep-arately command, *and to guard against inadvertence, stealth and fraud* in legislation.

*Id.* at 557 (emphasis added).

As this court explained later, the primary aim of "one-subject" provisions in state constitutions is to restrain "log-rolling" in the legislative process. *Gellert v. State*, 522 P.2d 1120, 1122 (Alaska 1974).

Since its earlier decisions, this court has consistently been extremely liberal in finding that various combinations of statutory provisions could be construed to "fairly relate" to the same subject.[3] For example, the *Gellert* court added that the constitutional provision should be construed with "considerable breadth." *Id.* This court has since construed it with such "breadth" as to render the rule meaningless. Moreover, this majority opinion pays little heed to the second purpose of the single-subject rule, i.e., "to guard against inadvertence, stealth and fraud." This decision invites stealth or fraud by initiative promoters, and inadvertence by voters, by stretching the rule to allow contrived pairings of a serious proposal to repeal a state law with a vague directive to the Governor to lobby Congress to repeal a locally unpopular federal act.

The majority's view of the single-subject rule actually allows disparate subjects to be enfolded within the cloak of a broad generality.[4] In *Gellert*, for instance, this

---

who buy extra auto-safety options; (c) make vehicular homicide a capital-punishment offense; and (d) direct the Governor to lobby the federal government until it agrees to ban the importation of foreign subcompacts. All of these would-be laws "relate to" cars, and such an assortment of provisions would comply with this court's extremely liberal interpretation of the single-subject rule.

2. *Short v. State*, 600 P.2d 20, 24 (Alaska 1979). Actually, my difference with the majority might be summed up as turning on different definitions of the word "fairly"; in my view, the various provisions of a single enactment, or initiative, should relate "in a fair manner" to the same subject, not just relate "moderately" or "tolerably" to the same subject. Oxford American Dictionary (1980 ed.); Webster's Third New International Dictionary (1967 ed.).

3. *E.g., North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 545 (Alaska 1978); *State v. First National Bank of Anchorage*, 660 P.2d 406, 415 (Alaska 1982).

4. Our application of the single-subject rule to initiatives should also involve a functional test much like that used by the Florida Supreme Court in reviewing recent ballot initiatives proposing constitutional amendments. For instance, in *Evans v. Firestone*, 457 So.2d 1351 (Fla.1984), the court held that Florida's single-subject rule (quite like Alaska's) was violated by a ballot initiative entitled "CITIZEN'S RIGHTS IN CIVIL ACTIONS," which proposed a state constitutional amendment that would, essentially, encourage summary judgment in cases lacking a genuine dispute as to the material facts and would also limit liability for certain types of damages. The court reiterated its view that "where separate provisions of a proposed

**1184**

court decided that two topics, a flood control project in Fairbanks and small boat harbors for coastal villages, both pertained to "one ongoing plan" for water resources development. As Justice Fitzgerald pointed out in his dissent, while it was true that all of the projects included in the proposition involved water, so do dams, bridges, sewer systems, and many other things. Justice Fitzgerald explained that:

> It is admittedly difficult to determine whether a group of projects has one subject matter but difficulty of enforcement does not discharge the duty of this court to ensure that constitutional limitations are observed. And although the judgment of the legislature is entitled to great weight on the issue, it is finally for this court to make the determination. As is accurately noted by the majority, the purpose of the one-subject requirement is to prevent logrolling, i.e., the assembling of a number of pet projects into one bill to consolidate the support for each to achieve a sufficient total. The proposition in question is a good example of what the constitutional provision sought to avoid. It is designed to gather voter support for a project in the interior of Alaska by linking it with harbor projects dear to the coastal towns and villages. This is justified, according to the majority, because federal funding is available and the projects are part of a Corps of Engineers program for the state of Alaska. I do not agree with the logic of the majority that such considerations justify the interpretation which is now to be applied, since for all practical

purposes it renders the constitutional provision meaningless.

*Id.* at 1124.

In this court the liberal interpretation of the single-subject rule was first developed in cases dealing with *legislative* enactments, such as *Suber v. Alaska State Bond Committee* in 1966 and *Gellert v. State* in 1974. In cases after *Gellert*, this court continued to accept strained combinations of subjects as complying with the rule.[5] After the single-subject rule was applied to initiatives, this court continued to apply the same liberal interpretation of the rule. This court has since decided to apply the same extremely deferential standard of review to initiatives that it applies to legislation. However, the two processes are quite different. Ideally, if the purposes underlying the single-subject rule are to be realized, courts should consider the contexts to which this constitutional provision applies.[6]

Whenever a bill becomes law through the initiative process, all of the problems that the single-subject rule was enacted to prevent are exacerbated. There is a greater danger of logrolling, or the deliberate intermingling of issues to increase the likelihood of an initiative's passage, and there is a greater opportunity for "inadvertence, stealth and fraud" in the enactment-by-initiative process. The drafters of an initiative operate independently of any structured or supervised process. They often emphasize particular provisions of their proposition, while remaining silent on other (more complex or less appealing) provisions, when communicating to the public.

---

amendment are an 'aggregation of dissimilar provisions (designed) to attract support of diverse groups to assume its passage,' ... the defect is not cured by ... application of an over-broad subject title...." *Id.* at 1354. Furthermore, part of the Florida court's test is functional: "where such an initiative performs the functions of different branches of government, it clearly fails the functional test for the single-subject limitation...." *Id.* In our case the initiative at issue also proposes to perform both executive and legislative functions.

**5.** In *First National Bank,* this court again recited our so-called standard in deciding whether a

legislative act's provisions complied with the single-subject rule. We concluded that in light of prior decisions this court "must likewise conclude that 'land' is not an unduly broad subject...." 660 P.2d at 415.

**6.** As observed in *Evans v. Firestone,* 457 So.2d 1351, 1357 (Fla.1984), "the initiative process does not provide for a filtering mechanism for the drafting of a proposal through amendments, public debate, and legislative vote. This lack of input in the drafting of an initiative proposal is an important reason for the single-subject limitation."

Indeed, initiative promoters typically use simplistic advertising to present their initiative to potential petition-signers and eventual voters. Many voters will never read the full text of the initiative before the election. More importantly, there is no process for amending or splitting the several provisions in an initiative proposal. These difficulties clearly distinguish the initiative from the legislative process.

To the extent that it is rational at all, this court's continuing refusal to rigorously apply the single-subject rule to legislation represents an understandable deference to the legislature as a concordant body of government. It also represents a respect for the legislative process itself: the elaborate procedure by which a bill originates, is reviewed by legislators and experts, and ultimately becomes law. There are no such safeguards, no such review process, between the filing of an initiative petition and its submission to the electorate.[7] A procedural vacuum does not deserve great deference.

I must emphasize that my position here suggests no disrespect of the people's right to make decisions and act in their own sovereign capacity rather than through their elected representatives. Indeed, the opposite is true. By seriously implementing the single-subject rule, this court would mandate that the essence of the initiative process be respected. We would insure that the will of the people is accurately and effectively expressed. In contrast, the majority's opinion permits initiative-drafters to juxtapose disparate issues in a single petition. This court thus reduces the likelihood that the eventual vote on the initiative will precisely reflect the will of the Alaska electorate.

In this case, the majority strays even farther from the constitutional provision by finding that the single-subject rule is some-how not violated by this initiative's pairing of a law and a non-law, the pairing of (1) the proposed repeal of state statutes regulating transportation and (2) the anti-Jones-Act directive to the Governor.

Our so-called standard in deciding whether a proposed law complies with the single-subject rule has been repeatedly recited by this court:

> Ultimately the decision in cases of this kind must be made on a basis of practicality and reasonableness. In determining whether a bill is confined to one subject, we agree with the statement:
>
>> All that is necessary is that the act should embrace one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.

*Short,* 600 P.2d at 24 (quoting *Gellert,* 522 P.2d at 1123, quoting *Johnson v. Harrison,* 47 Minn. 575, 50 N.W. 923, 924 (1891)).

First of all, this standard seems to be no standard at all. It says that all matters falling "under some one general idea" must be connected or related, either logically or in popular understanding.

Basically, the *Gellert* "test" would be more useful if stripped of its overmodifying circumlocution. A stronger and clearer version of the *Gellert* "test" would read as follows:

> An act or initiative should embrace one subject. By this we mean that all matters treated should be logically connected.

Naturally, merely rewording the existing "test" does not automatically turn this court away from the Anything Goes approach of the "merely . . . germane" stan-

---

7. In surveys in other states voters have expressed notable frustration or dissatisfaction regarding the way in which initiative and referendum proposals are presented on the ballot. One study has indicated that more than half of voters (surveyed on their views of the presentation of ballot proposals) reported that only "*some* of the proposals were clear". Comment, "The Future of Initiative and Referendum in Missouri," 48 Missouri Law Review 991, 1001, n. 93. *Also see* D. Butler and A. Ranney, *Referendums—A Comparative Study of Practice and Theory* (1978).

dard embraced in *Gellert*. But it is a necessary start. Then we must interpret what "connected" means. Certainly provisions that are "inextricably intertwined" are connected, and it is reasonable to infer from the intertwining language in *North Slope Borough v. Sohio*, 585 P.2d at 545, that this court was focusing on whether provisions have an *impact* on one another. I favor requiring provisions to be *reasonably interdependent*. Still, no articulation of a revised standard will do away with debates as to what amounts to connectedness, or intertwining or interdependence. Nevertheless, legislators and initiative promoters should realize that enactments should be presented clearly and candidly. Toward that end, we need to use a plainer standard and be more willing to look closely at the logic of an asserted connection and the reasonable interdependence of separate provisions. Our ruling should be that the court seriously means to effect the purposes of our constitution's single-subject rule, to discourage logrolling and the type of duplicity evident in the anti-A.T.C. initiative before us.

Still, even under the vague tautology that we adopted as our limited standard of review in *Gellert*, I cannot agree that the two parts of the initiative at issue here can be said to fairly relate to the same subject, either "logically" *or* in "popular" understanding. What would determine the logic of the asserted connection between the two parts, the abolition of the Alaska Transportation Commission and the expression of anti-Jones-Act wishes to the Governor?

The majority states that it does not matter that the repeal of the state laws does "not interact or interrelate legally" with the repeal (actually the expressed wish for the repeal) of the federal law. They contend that the alleged interaction is self-evident, adopting the "perspective of the miner at Minto who wants to bring his supplies from Seattle." Is this logical? Any combination of things, ideas, laws and resolutions can be labelled as a "subject" as long as someone so classifies them. The majority notes that the two sources of regulation of transportation, the Alaska Transportation Commission and the federal Jones Act, "may well be perceived by deregulators as one of this state's most serious problems." The perception, or labelling, advanced by the proponents of an initiative should not determine whether its different parts relate fairly and logically to a single subject.[8] The majority's treatment of this matter focuses not on the initiative's *subject*(s) but rather on its general *policy objectives* and its drafters' perceptions. The initiative addresses two different subjects that its proponents seek, by a broad title or policy statement, to place under a single umbrella. But the single-subject rule is concerned with *subjects*, not with catch-all titles.

Harking back to *Gellert*, the majority states that the two different parts of this initiative are, from one viewpoint, "inextricably related, certainly far more integrated and related than boat harbors and flood control projects." I disagree. At least the legislation at issue in *Gellert* did not misleadingly mix the enactment of a state law with a mere directive reflecting popular sentiment of the repeal of an unpopular federal act.

In response to the concern that we not apply a standard to the initiative process

---

**8.** It is irrational to focus on the drafters' stated policy objectives to determine whether an aggregate of provisions complies with the single-subject rule. For example, a plausible sounding policy objective would be "Improvement of the Alaska Economy," a title under which initiative drafters could present such provisions as (1) setting up a state commission to promote tourism ·in Alaska; (2) directing the Governor to personally greet each ferry ship bearing out-of-state tourists to the state capital; (3) setting up a state office in Washington, D.C. to promote a constitutional convention for the purpose of amending the equal protection clause or the privileges and immunities clause of the U.S. Constitution, so that Alaska could enact "immigration" requirements to restrict the influx of migrating Outsiders; and (4) raising the fines for drunk driving, with the revenue from such fines to be used to increase the amounts, and decrease the interest rates, of AHFC loans available to Alaska home buyers. From the perspective of such an initiative's promoters, or from the perspective of a tourism-industry employee who wants to buy a home, these incongruous provisions would improve Alaska's economy.

different from that which we apply to acts of the legislature, this court should take this opportunity to set forth a stronger standard, *prospectively* applicable to *both* forms of legislation. *CFEC v. Byayuk,* 684 P.2d 114, 117–118 (Alaska 1984); *Division of Elections v. Johnstone,* 669 P.2d 537, 542–544 (Alaska 1983); *Warwick v. State,* 548 P.2d 384, 393 (Alaska 1976). Although I agree with Justice Burke's willingness to apply retroactively the ruling we favor, an acceptable argument can be made to the effect that the anti-ATC/anti-Jones-Act promoters were relying on our prior decisions in this area, such that they had reason to believe that Anything Goes, even linking together a law to abolish the state's transportation commission and a plebiscite on popular sentiment against a federal law affecting interstate shipping. A prospective application would be appropriate here.

## II.

As for the majority's secondary conclusion, I cannot agree that the initiative's "Jones Act" provision can plausibly be construed to create a "law." The majority observes that "nothing in the constitution of this state limits the legislature's power to enact laws establishing as this state's policy a change in existing federal law," but this observation begs the question: What distinguishes a "law" from a resolution?

Article XI § 1 of the state constitution clearly states that the people may propose and enact "laws." Simply because an initiative provision tells the Governor to try "to persuade" Congress to repeal a federal law does not mean that provision establishes anything more than an *expression* of policy.

The majority mistakenly compares this initiative provision to the Territorial Legislature's enactment of a law that established the Alaska Statehood Committee to lobby for statehood for Alaska. But the Jones Act provision of the initiative establishes no such committee, or commission, or board to take specific actions. Instead, this provision presents a plebiscite, a rather vague directive that expresses the popular desire to free Alaska's commerce from the harmful effects of the federal Jones Act.

The majority also suggests that this plebiscite is law-like because it tells the Governor to do his best to persuade Congress to repeal the Act, since the legislature "frequently enacts laws prescribing the conduct of officials or agencies of state government on matters over which the state has no legal jurisdiction." But what specific conduct does this initiative provision enforceably prescribe for the Governor? The question again involves inquiry into the meaning of "law."

Recently, in *State ex rel. Brant v. Beermann,* 217 Neb. 632, 350 N.W.2d 18 (1984), the Nebraska Supreme Court rejected a proposed initiative aimed at expressing the desire of the populace for a nuclear freeze and the forwarding of that expression to leaders in the governments of the United States and the Soviet Union. The proposed initiative was held to be "nothing more than a nonbinding expression of public opinion." *Id.* 350 N.W.2d at 23. In *Beermann* the Nebraska court discussed whether a measure seeking an advisory "straw vote" on the electorate's sentiments on a particular issue is a proper subject for the initiative. The *Beermann* court reviewed with approval the discussion of a similar question by the Supreme Judicial Court of Massachusetts *Opinion of Justices Relative to the Eighteenth Amendment,* in 262 Mass. 603, 160 N.E. 439 (1928). In the Massachusetts case the House of Representatives had asked the justices whether a "proposed law" introduced by an initiative petition was really a "law" within the meaning of the initiative provisions of the state constitution. The court held that it was not a law and stated the following:

> *The word "law" imports a general rule of conduct with appropriate means for its enforcement declared by some authority possessing sovereign power over the subject; it implies command and not entreaty; it is something different in kind from an ineffectual expression*

*of opinion possessing no sanction to compel observance of the views announced....* The result of the vote as proposed in this initiative petition would be lacking in any effective force.... Superficial appearances cannot clothe with the attributes of law something in substance vain and inoperative. The mandate to the Secretary of the Commonwealth ... to tabulate the returns of the votes and to "transmit copies ... to each senator and representative in congress from this commonwealth" is *subsidiary* and *incidental* to the main purpose of the proposed law; it relates to a matter which standing alone possesses no legal force....

160 N.E. at 440 (emphasis added).

In the case before this court, the second sentence of Section 4 of the initiative states that until the Jones Act is repealed, "the governor shall publish an annual report documenting the harmful effects of the Act on Alaska commerce, and progress made towards its repeal." However, this clearly subsidiary instruction is merely incidental to the main objective of the proposed "law"; it relates to a matter that possesses no legal force, to a directive that merely tells the governor to do his "best" to get the federal Jones Act repealed.

The Alaska Constitution reserves to the people the power to propose and enact "laws" by the initiative process. Our cases have liberally construed this law-making power. Still, even under the most liberal construction, the reserved power of initiative and referendum does not encompass all possible actions of the legislature.[9] It does not refer to mere resolutions or expressions of popular wishes. A statute declares law. It must be introduced in the form of a bill, then passed with certain formalities and presented to the Governor for signature. But a resolution of the legislature is just a collective expression of opinion. It certainly is not subject to the same formalities or consequences of enactment.

As recently noted in a pertinent part of a decision of the Supreme Court of California, in *A.F.L.–C.I.O. v. Eu*, 36 Cal.3d 687, 206 Cal.Rptr. 89, 686 P.2d 609 (1984):

"It is frequently said that the distinction between bills and resolutions is that resolutions are not law. As a generalization this is probably accurate, if by 'law' is meant those legislative actions which operate on all persons in society, and must be enforced by the executive department, and sustained by the judiciary." (1A Sutherland, Statutory Construction (Sands rev. ed. 1972) p. 335.)

*Id.* 206 Cal.Rptr. at 104, 686 P.2d at 624. I further agree with the California Supreme Court that "a resolution, as distinct from a statute, is essentially an enactment which only declares a public purpose and does not establish means to accomplish that purpose." *Id.* 206 Cal.Rptr. at 106 n. 23, 686 P.2d at 626 n. 23.

Although a statute may declare policy, as does a resolution, a statute also provides the means to carry out its substantive provisions. In the case before this court, I cannot agree that the initiative's Jones Act provision establishes the means to accomplish its purpose. As noted by the California Supreme Court, there is a functional as well as formal distinction between a policy declaration that is part of a "law" or statute and a policy declaration that is simply a resolution. In the former instance, administrative agencies and the courts can cite and rely on the policy declaration when interpreting and applying other statutory provisions. No such legal effectiveness is ascribed to a policy declaration that is simply a conclusory directive to the Governor to do his "best" regarding a subject beyond the state's legislative jurisdiction. The initiative's disputed provision amounts not to a "law" but, at most, to a cross between a resolution and a wishful writ of mandamus aimed at the Governor.

Again, our main concern should be that all matters (legislative enactments, initiative petitions and even proposed resolutions) should be presented *clearly* and honestly to the people of Alaska. As George

9. Article XI refers only to the enactment of laws and the approval or rejection of legislative acts.

Orwell observed, a great enemy of clarity is insincerity.[10] Here, the binding enactment of an enforceable state law should not be attached to a non-binding provision that implicitly promises to compel the Governor to persuade Congress to repeal a locally unpopular federal act. To do so is simply misleading.

It is probably a good idea to extend the use of the direct vote to resolutions or expressions of policy preferences on matters of statewide, national and even international concern. Indeed, the initiative process seems better suited to express broad declarations of the people's desires than it is to enact technical, often convoluted, statutes. However, Article XI indicates that the initiative was intended to function as a reserved legislative power, a means of enacting "laws." Here, the Jones Act provision of the initiative does not meet that standard.

The only way that any vote on such an initiative as this could accurately reflect the will of the people would be to sever the unrelated provisions and present them on the ballot as distinctly independent proposals. This would counter the "piggyback" effect whereby a simplistic resolution regarding a highly unpopular federal law is likely to carry along the enactment of whatever state law is attached for the ride. Any insistence on tying together such independent proposals in one initiative suggests that voters do not deserve a clear *opportunity* to make decisions on an issue-by-issue

basis; it forces voters to accept or reject a package of distinct provisions only on an all-or-nothing basis. Voters deserve better. They deserve to have this court apply a more exacting interpretation of the single-subject rule.

In sum, this initiative violates the original purposes of the single-subject rule and it improperly ties together a law and a mere resolution. To guard against inadvertence by petition-signers and voters and to discourage stealth by initiative drafters and promoters, I would find this initiative invalid.

BURKE, Justice, dissenting.

This case provides a good example of the risk inherent in the announcement of a decision prior to the issuance of our formal opinion.[1] In this instance, the added scrutiny compelled by Justice Moore's vigorous dissent has convinced me that our previously announced decision was dead wrong.[2] Rather than commit a second offense, I prefer to eat my share of the crow now.

If it were possible to do so now, I would vacate our decision *sua sponte*, and hold the initiative measure invalid, for reasons essentially the same as those expressed by my dissenting colleague, Justice Moore.

---

**10.** G. Orwell, "Politics and the English Language," in 4, *In Front of Your Nose (The Collected Essays, Journalism and Letters of George Orwell)* pp. 127–140, at 137 (1968).

**1.** It has been our practice, in cases where there are compelling reasons to do so, to announce our decision prior to the issuance of a formal opinion. The order that was entered in this case is typical: "The judgment of the Superior Court is AFFIRMED. Opinions will follow." In this particular instance, we were persuaded to announce our decision in such manner because of its importance to preparations then being made for the 1984 general election.

This is a worthwhile practice in cases requiring an immediate decision, and I do not condemn it. It is, however, a practice that involves a certain amount of risk. As once observed by the late Chief Justice Roger Traynor,

[We] have not found a better test for the solution of a case than its articulation in writing, which is thinking at its hardest. A judge, inevitably preoccupied with the far-reaching effect of an immediate solution as a precedent, often discovers that his tentative views will not jell in the writing. He wrestles with the devil more than once to set forth a sound opinion that will be sufficient unto more than the day.

R. Traynor, *Some Open Questions on the Work of State Appellate Courts*, 24 U.Chi.L.Rev. 211, 218 (1957).

**2.** Our decision was announced on September 13, 1984. At that time, I joined in the order of the court. *See* note 1, *supra*. Justice Moore, as he does now, dissented.