**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 17, 2025

*Stgnec, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 17, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JEWELS HELPING HANDS and BEN STUCKART, | No. 102814-8 |
| Petitioners, | EN BANC |
| v. | Filed: <u>April 17, 2025</u> |
| BRIAN HANSEN, | |
| Respondent, | |
| CITY OF SPOKANE, SPOKANE COUNTY, and VICKY DALTON, in her official capacity, | |
| Defendants. | |

GORDON McCLOUD, J.—The housing crisis is a problem for all levels of government—national, state, and local—and all those levels of government have addressed it. Most recently, the United States Supreme Court has ruled that states retain the power to criminalize homeless encampments, regardless of whether shelter space is available;[1] the Washington State Legislature has adopted a detailed

___

[1] *City of Grants Pass v. Johnson*, 603 U.S. 520, 144 S. Ct. 2202, 219 L. Ed. 2d 941 (2024).

statewide policy addressing homeless encampments through voluntary state-local partnerships and resource allocation;[2] and the city of Spokane has opted in to the statewide partnership and adopted an ordinance allowing camping on public property when there is no shelter space available (with exceptions for certain sensitive public areas).

The question presented by this case is whether there is still room for the people of Spokane to legislate on one aspect of this problem directly through the initiative process. More specifically, the question is whether Spokane resident Brian Hansen's proposed 2022 Initiative 2023-4 (Hansen Initiative) to greatly expand Spokane's criminalization of camping falls within the scope of the local initiative power.

The answer must be based on our case law holding that (1) the scope of the local initiative power is more limited than the scope of the constitutional, statewide initiative power[3] and (2) the local initiative power extends only to matters that are

---

[2] RCW 43.185C.160.

[3] *See City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2d 1, 7-8, 239 P.3d 589 (2010) (citing WASH. CONST. art. II, § 1; *1000 Friends of Wash. v. McFarland*, 159 Wn.2d 165, 167, 149 P.3d 616 (2006) (plurality opinion); *Lauterbach v. City of Centralia*, 49 Wn.2d 550, 554, 304 P.2d 656 (1956)).

"legislative"[4] in nature and not already under the exclusive authority of a local or state legislative body.[5]

As the hearing examiner and the Court of Appeals in this case both explained, this is a close case. The Washington State Legislature has certainly enacted detailed laws on this complicated policy matter; but the legislature acted by adopting a voluntary state-local partnership model that invites local experimentation. Spokane has also acted on this complicated policy matter by adopting a strategic plan to address homelessness in partnership with the State; but that Spokane plan contains local flexibility.

The trial court and the Court of Appeals ruled that the flexibility in these state and local enactments left room for the people of Spokane to vote directly on the Hansen Initiative with its detailed, specific limits on homeless encampments. Those courts characterized the Hansen Initiative as a legislative matter to which the local initiative power extends.[6]

---

[4] *Id.* at 8 (citing *Ruano v. Spellman*, 81 Wn.2d 820, 823, 505 P.2d 447 (1973)).

[5] *Protect Pub. Health v. Freed*, 192 Wn.2d 477, 482-83, 430 P.3d 640 (2018) (quoting *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006)).

[6] *Jewels Helping Hands v. Hansen*, 29 Wn. App. 2d 1, 4, 539 P.3d 68 (2023).

We disagree. The scope of the local initiative power is more limited than the scope of the constitutional, statewide initiative power.[7] As mentioned above, under our controlling precedent, a local initiative exceeds its proper scope if it covers a topic that is "administrative" rather than "legislative" in nature.[8] The Hansen Initiative "administer[s] the details" of Spokane's preexisting policy approach to camping.[9] For that reason, it falls on the administrative, rather than the legislative, side of the line. A local initiative that falls on the administrative side of the line exceeds the proper scope of the local initiative power.

We therefore reverse.

FACTUAL AND LEGAL BACKGROUND

This case involves decades of state and local efforts to combat homelessness in Washington. In 2005, the legislature started a state-local collaboration with the goal of ending homelessness in Washington. RCW 43.185C.005 (Homeless Housing Assistance Act or HHAA). In 2018, in response to a dramatic increase in homelessness, the legislature passed the Washington Housing Opportunities Act

---

[7] *See Our Water*, 170 Wn.2d at 7-8 (citing WASH. CONST. art. II, § 1; *1000 Friends of Wash.*, 159 Wn.2d at 167; *Lauterbach*, 49 Wn.2d 550 at 554).

[8] *Id.* at 8 (citing *Ruano*, 81 Wn.2d at 823).

[9] *Id.* at 13-14 (quoting *Heider v. City of Seattle*, 100 Wn.2d 874, 876, 675 P.2d 597 (1984)).

and made it a part of the HHAA. RCW 43.185C.045, .160. The HHAA provided incentives for localities to create five-year plans to fight homelessness and increased State oversight over local progress made on those plans. RCW 43.185C.045, .160.

Spokane opted in to this process and eventually adopted a plan that covered 2020-2025. Clerk's Papers (CP) at 331-39.[10] That plan included the following section describing Spokane's detailed overall strategy on homeless encampments:

> Over the last two years, . . . Spokane has worked diligently on addressing unsheltered homelessness, as those numbers appear to increase and visibility of encampments has impacted citizen's perceptions of safety. As a result, . . . Spokane has invested more deeply in street outreach, an intervention that has proven results through direct engagement with people living unsheltered, and in re-engaging a coordinated outreach network to case conference and support efforts to help complex cases and to ensure outreach professional are able to support efforts to reach people in need throughout the county.
>
> . . . Spokane has also begun utilizing a database and an integrated system to better track and map encampments and improve opportunities to send targeted service supports to those areas. Outreach then is utilized to provide a service-rich engagement strategy when encampments have to be cleaned up in order to try and get people into the homeless service system to prevent the camps from being re-formed.
>
> In light of the legal context for encampments in our region, there has been an increased emphasis on creating emergency shelter and focus on how that component of the system is addressing the community need. This has led to an emphasis on the funding of emergency shelter at previously unprecedented levels.

---

[10] Spokane also promulgated a plan under a previous version of the statute that covered 2015-2020. CP at 268-98.

> Even still, the [continuum of care] recognizes that shelter does not end homelessness and that deeper investments in permanent housing will be required in order to have long-term impact. The balance is part of ongoing discussions at all levels and will likely remain at the forefront during this transition phase.

*Id.* at 339 (Section 2.2.6. Encampments).

Around the same time, the Ninth Circuit Court of Appeals issued its (now overruled) decision in *Martin v. City of Boise.*[11] *Martin* ruled that the federal constitution barred localities from criminalizing camping on public property when there is no alternative housing or shelter available. *Id.*

Although the United States Supreme Court later overruled *Martin*, that Ninth Circuit decision triggered changes to the law in many localities—including Spokane. And those changes led to the Hansen Initiative. We therefore summarize Spokane's history of dealing with homeless encampments before, during, and after *Martin* before turning to the procedural history of this case.

### A. Spokane's Pre-*Martin* *Municipal Code*

Spokane has addressed homeless encampments in its city code for many years. Ch. 12.02 Spokane Municipal Code (SMC) "regulate[s] and control[s] the obstruction of public rights-of-way . . . so that those rights-of-way remain accessible and safe for . . . public use." SMC 12.02.005. Article VI of that chapter,

---

[11] 920 F.3d 584 (9th Cir. 2019), *overruled by Johnson*, 603 U.S. 520.

entitled "Protection of Public Lands and Properties," states Spokane's intention to protect its public lands "from the detrimental effects of unregulated human activity." CP at 50 (amending former SMC 12.02.1000 (2018)).

Former SMC 12.02.1002 (2018) defined camping as "residing on or using public property for living accommodation purposes." Former SMC 12.02.1002(A).[12] The former SMCs defined "public property" as any property owned or managed by Spokane or another governmental agency. Former SMC 12.02.1002(B). And former SMC 12.02.1010[13] criminalized camping on public property as a misdemeanor unless the mayor allowed such camping during an emergency:

> A. No person may camp in or upon any public property including, but not limited to, conservation lands and natural areas abutting the Spokane River and its tributaries unless specifically authorized by declaration of the Mayor in emergency circumstances.
>
> B. A violation of this section is a misdemeanor.
>
> C. Unless otherwise subject to custodial arrest under RCW 10.31.100, individuals subject to enforcement under this section shall be cited and released rather than being booked into jail.

---

[12] Former SMC 12.02.1002, https://web.archive.org/web/20220630200104/https:/my.spokanecity.org/smc/?Section=12.02.1002 [https://perma.cc/39N6-BRY7].

[13] Former SMC 12.02.1010 (2018), https://web.archive.org/web/20220413183424/https:/my.spokanecity.org/smc/?Section=12.02.1010 [https://perma.cc/3BHQ-YJQZ].

*B. Spokane's Post-*Martin *Code Effective 2022-23*

In 2022, in response to the Ninth Circuit's *Martin* decision, the Spokane City Council enacted Ordinance C36272 (*Martin* Ordinance). That ordinance substantially amended the prior camping ordinance. CP at 47 ("Since *Martin* . . . in 2019 . . . Spokane has not updated its illegal camping ordinance."). The *Martin* Ordinance was "intended to bring City code into better alignment with" the *Martin* ruling. *Id.*

The *Martin* Ordinance revised and expanded the definitions in ch. 12.02 SMC and added several new code sections that created a comprehensive scheme for regulating camping by homeless individuals on public land. Notably, it amended the prior definition of "camping" and added several new definitions:

> A. "Camp" means to pitch, erect or occupy camp facilities, or to use camp paraphernalia or both, for the purpose of, or in such a way as will facilitate, outdoor sheltering for living accommodation purposes or for remaining outdoors overnight, or using a camper, recreational vehicle, trailer, or other vehicle for living accommodation purposes or for the purpose of remaining overnight.
>
> . . . .
>
> B. "Camp facilities" include, but are not limited to, tents, huts, temporary shelters, campers, recreational vehicles, or trailers.
>
> C. "Camp paraphernalia" includes but is not limited to tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment.

D. "Park or park facility" means any real property, building, structure, equipment, sign, shelter, swimming pool, vegetation, playground, or other physical property owned or controlled by the City for park purposes. Park or park facility includes all associated areas, including but not limited to parking lots for parks and pools. All park property, whether developed or undeveloped, including adjacent buffer lands, conservation lands and natural areas, shall be considered to be a "park facility" for purposes of this chapter.

. . . .

G. "Right-of-way" means any street, avenue, boulevard, highway, sidewalk, alley, passageway, or other thoroughfare, whether abutting public or private property, used for vehicular or pedestrian travel.

*Id.* at 51 (amending former SMC 12.02.1002). The *Martin* Ordinance also added a new section, SMC 12.02.1003, entitled "Protection Against Harm to Waterways," which criminalized erecting structures, digging, and several other activities along the Spokane River or Latah Creek. *Id.* at 52.

Of particular importance for this case, the *Martin* Ordinance also complied with the *Martin* decision by barring arrests for camping on public property (except in several sensitive areas) if no public shelter space were available. Its new SMC 12.02.1010 entitled "Unauthorized Camping on Public Property – Violation" provided:

A. Prohibition

1. No person may camp in or upon any public property including, but not limited to, on conservation lands and natural areas abutting the Spokane River, Latah Creek and ((its)) their

9

tributaries, unless specifically authorized by declaration of the Mayor in emergency circumstances.

2. At all times, regardless of the availability of shelter, it is unlawful to camp where such activity poses:

    a. a substantial danger to any person,

    b. an immediate threat and/or an unreasonable risk of harm to public health or safety, or

    c. a disruption to vital government services.

In such circumstances, the encampment shall be subject to expedited removal pursuant to SMC 12.02.1012.

3. At all times, regardless of the availability of shelter space or beds, it is unlawful to camp or store personal property, including camp facilities and camp paraphernalia, or to have unauthorized encampments, at any time in the following locations:

    a. Underneath or within 50 feet of any railroad viaduct located within the Spokane Police Department's Downtown Precinct boundary as shown out in Exhibit A; and

    b. Within three blocks of any congregate shelter provided that signs are posted prohibiting camping that are clearly visible to pedestrians.

B. Penalty

A violation of this section is a misdemeanor. Unless otherwise subject to custodial arrest on a warrant or probable cause for another crime, individuals subject to enforcement under this section shall be cited and released rather than being booked into jail. With the exception of those who do not meet the criteria for acceptance into community court, individuals subject to enforcement under this chapter shall be referred to community court by officer citation.

C. Enforcement

1. Law enforcement officers shall not issue a criminal citation to enforce unauthorized camping in violation of section 12.02.1010 (A)(1) when an individual is on public property at a

time when there is no available overnight shelter. Nothing in this section shall be construed to prevent the enforcement of section 12.02.1003 at all times, regardless of the availability of shelter, when a person is causing harm to the Spokane River or Latah Creek or to the banks and natural areas that buffer these waterways; nor shall this section be construed to prevent the expedited removal of an encampment on any public property pursuant to section 12.02.1012 (C).

    a. Prior to issuing a citation to a homeless person who is sleeping, lying, sitting, or camping outdoors, the police officer must first confirm that a 24/7 low-barrier shelter had available space during the previous twenty-four hours that could have been utilized by that individual.

    b. Confirmation of overnight shelter availability may come from data provided through a City-approved data system or through direct contact with regional low- barrier shelters, and shall consist of the following:

        i. whether a shelter has available space for sleeping,

        ii. the number of available spaces, and

        iii. the guests each shelter will accept (i.e. men, women, families with children, etc.).

2. Sections 12.02.1010 (A)(2) and (A)(3) are enforceable at all times regardless of shelter availability.

*Id.* at 53-54 (amending former SMC 12.02.1010 (2018)).

Finally, the *Martin* Ordinance created a notice process for removing encampments in a new SMC 12.02.1012 entitled "Removal of Unauthorized Encampments and Individual Camps." *Id.* at 54-55. That code section provides, "Upon a determination by law enforcement or designated City personnel that an area constitutes an unauthorized encampment pursuant to 12.02.1010, or that an individual is engaged in unlawful camping or storage of personal property pursuant

to 12.02.1010, the personal property, camping paraphernalia, camp facilities, and all other property . . . may be removed" through the procedures laid out in the SMCs. *Id.* at 54-58. This section also provided procedures for preserving private belongings removed during an encampment sweep. *Id.* at 56.

### C. Hansen Initiative Language Effective 2023-Present

One of the encampments subject to the *Martin* Ordinance was called "Camp Hope." Camp Hope was located in a neighborhood close to a school.[14] *Id.* at 66-67. The State contracted with Jewels Helping Hands to provide direct services to the Camp Hope residents to help them exit homelessness. *Id.*

Despite Jewels' efforts, the area surrounding the encampment saw a sharp increase in its four-year crime rate, with some of the criminal activity occurring near the school. *Id.* at 173-74. Brian Hansen, a resident of Spokane, took notice and proposed an initiative to address the issue. *Id.* at 29.[15]

Hansen's Initiative responded to this rise in crime by banning camping in areas within 1,000 feet of a school, park, or childcare facility. *Id.* at 30. The

---

[14] Camp Hope was apparently the impetus for Hansen's initiative. CP at 173-74. But the camp itself was apparently not operating during this lawsuit. *Id.* at 66. Nuisance abatement litigation may have shut Camp Hope down, but the record is unclear. *Id.* at 173.

[15] Spokane is a "home-rule" city that has its own charter, and that charter allows citizens to legislate directly via initiative and referendum. CITY OF SPOKANE CHARTER, art. IX, §§ 81-83.

Hansen Initiative accomplished this by adding a new subsection (c) to SMC

12.02.1010(A)(3). In the context of the *Martin* Ordinance quoted at length above,

that new provision became subsection (3)(c) and it reads:

> 3. At all times, regardless of the availability of shelter space or beds, it is unlawful to camp or store personal property, including camp facilities and camp paraphernalia, or to have unauthorized encampments, at any time in the following locations:
>
>> a. Underneath or within 50 feet of any railroad viaduct located within the Spokane Police Department's Downtown Precinct boundary as shown out in Exhibit A; and
>>
>> b. Within three blocks of any congregate shelter provided that signs are posted prohibiting camping that are clearly visible to pedestrians.
>>
>> c. *In public within one thousand (1,000) feet of the perimeter of the grounds of a park (SMC Section 12.06A.030(B&D)), a day care center or child care facility (RCW 35.63. 170(3-4)), or a public or private school (RCW 28A.150.010 and RCW 28A.195.010).*

*Id.* at 30 (emphasis added). Spokane has many parks, day care centers, and schools,

so this greatly expanded Spokane's criminalization of camping. *Id.* at 67. Like

SMCs 12.02.1010(A)(3)(a)-(b), the new subsection (c) could be enforced

"regardless of the availability of shelter space or beds." *Id.* at 30.

The Hansen Initiative eventually received enough signatures to qualify for

the ballot, and a hearing examiner reviewed it to determine if it fell within the

permissible scope of the local initiative power. *Id.* at 195-201.

On first review, the hearing examiner asked the initiative sponsors to amend the statute so that it referenced definitions in state statutes. *Id.* at 200-01. The hearing examiner also noted that a local initiative exceeds its proper scope—and would be invalid—if it (1) "include[s] more than one subject matter," (2) is "administrative" as opposed to "legislative" in nature, or (3) interferes with the exercise of a power delegated by state law to the governing legislative body of a city. *Id.* at 196 (citing *City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2 1, 8, 239 P.3d 589 (2010); *City of Sequim v. Malkasian*, 157 Wn.2d 251, 264, 138 P.3d 943 (2006); *City of Burien v. Kiga*, 144 Wn.2d 819, 824-25, 31 P.3d 659 (2001); *Ruano v. Spellman*, 81 Wn.2d 820, 823, 505 P.2d 447 (1973)). He concluded that the initiative did "not exceed the limits of the initiative power." *Id.*

Hansen amended the initiative to address the hearing examiner's request for citations to RCW definitions and resubmitted it. *Id.* at 203-05.

On second review, the hearing examiner again concluded that the initiative could survive a permissibility challenge and cleared it for the ballot. *Id.* at 205. But the hearing examiner amended his original opinion by cautioning that the initiative could be considered impermissibly "administrative" rather than permissibly "legislative" by the courts:

> "The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in nature if it merely pursues *a plan already adopted by the legislative body itself*, or some power superior to it."

*See Heider v. City of Seattle*, 100 Wn.2d 874, 876, 675 P.2d 597
(1984) (emphasis added) . . . . [I]f the municipality adopts an
ordinance covering a particular subject matter, that act may cut off the
power to pursue initiatives addressing the same matter. *See id.*
(holding a city ordinance changing the name of a street was immune
from referendum because it was an administrative action). This is
more likely to be the result if there is some comprehensive scheme
adopted by a city to address a particular subject. *See e.g.* [*Our Water*,
170 Wn.2d 1] (holding that initiative to ban fluoridation was
administrative in nature, given the comprehensive regulation of water
quality at both state and local levels). . . . It seems that courts
sometimes interpret the amendment of an ordinance as an
administrative act, even though the original adoption of the ordinance
was clearly legislative.

. . . [I]f Initiative 2023-4 is challenged, a court may find that it is
administrative in nature, because the city has already adopted an
ordinance addressing public camping. . . . [T]he Hearing Examiner
nonetheless believes that the initiative is fundamentally legislative in
nature. Thus, he is not inclined to change his prior opinion, although
there is a potential basis for legal challenge given some of the recent
jurisprudence on initiatives."

*Id.* at 204-05. The hearing examiner then allowed the initiative to move to the

ballot. *Id.* at 205.

PROCEDURAL BACKGROUND

*A. Trial Court Proceedings*

Jewels Helping Hands and Executive Director of the Spokane Low Income

Housing Consortium Ben Stuckart (collectively Jewels) filed a complaint raising

claims under three statutes: (1) ch. 7.24 RCW, the Uniform Declaratory Judgments

Act (UDJA), (2) ch. 7.40 RCW (injunctive relief statutes), and (3) ch. 29A.68

RCW (ballot-error statutes). CP at 5. They sought a declaration stating that the

15

Hansen Initiative exceeded the scope of the local initiative power because it (1) barred public camping through a zoning law, which the State allows only city councils to pass, (2) interfered with city council authority under the HHAA, and (3) constituted an impermissible "administrative" initiative rather than a permissible "legislative" initiative. *Id.* at 15-22. They also sought an injunction to remove the initiative from the ballot. *Id.* at 22.

Stuckart—in the affidavit required to support a RCW 29A.68.011 challenge—also asserted that the case was subject to .011's statutory deadline. *Id.* at 62. To meet that deadline, Stuckart asked the trial court to hear the case on August 10 or 11—an expedited timeline. *Id.* at 349.

Hansen opposed all of Jewels' claims. He argued that state law funded local homelessness efforts but did not regulate homelessness by policing homeless encampments. *Id.* at 176, 179-81. He continued that his initiative fell within Spokane's general police power to criminalize certain behaviors to promote health and sanitation and, hence, was not a local zoning law (which admittedly lies outside the local initiative power). *Id.* at 179. He argued that because Spokane has no comprehensive regulatory scheme to enforce its police powers over "public camping, burning and dumping," the proposed initiative would not interfere with any such scheme. *Id.* at 182. Hansen concluded that his initiative added a "new policy for the . . . protection of places where children gather from the documented

harms that are associated with encampments in . . . Spokane" rather than impermissibly administering the details of a preexisting policy. *Id.*

The trial court heard the matter on an expedited basis, and on August 23, it ruled that the plaintiffs had standing to sue but that their claims failed on the merits. Verbatim Rep. of Proc. (Aug. 23, 2023) at 5-19.[16]

### B. Court of Appeals Proceedings

Jewels appealed. CP at 344-45. Jewels moved for an emergency injunction to bar the initiative from appearing on the ballot. Appellants Jewels' Expedited Mot. for Inj. Pending Appeal at 3 (Wash. Ct. App. No. 39924-9-III (2023)). A Court of Appeals commissioner granted the injunction, but Hansen successfully moved to modify the commissioner's ruling, and the initiative went to the ballot. Ord. Granting Mot. to Modify Comm'r's Ruling (Wash. Ct. App. No. 39924-9-III (2023)).

Hansen also moved to dismiss the appeal on the ground that the election statute cited by the plaintiffs bars appeals from rulings made by the superior court under that statute's expedited timeline. Emergency Mot. to Dismiss Appeal at 2-3, (Wash. Ct. App. No. 39924-9-III (2023)). The Court of Appeals later denied this motion as "moot" in its published opinion (calling it "moot" because the court

---

[16] The court followed with a written order reiterating those rulings and incorporating its oral order. CP at 346.

affirmed the trial court on the merits). *Jewels Helping Hands v. Hansen*, 29 Wn.

App. 2d 1, 6 n.2, 539 P.3d 68 (2023).[17]

The Hansen Initiative passed by a large margin in the November 2023

election. *Id.* at 7 (taking judicial notice that initiative passed (citing ER 201)).

Given that the initiative had passed, the Court of Appeals conducted what it

termed a "postelection review" of the Hansen Initiative. *Id.* The Court of Appeals

ruled that the initiative did not exceed the scope of the local initiative power

because

- (1) The initiative is not a zoning ordinance, which would impermissibly interfere with zoning powers reserved by the State to the Spokane City Council. *Id.* at 11 (citing 8 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25:18, at 79, § 25:59, at 281, § 25:145, at 710, § 25:146, at 714 (3d ed. 2020)). The appellate court explained that zoning ordinances regulate the conduct of private landowners, not just public land users like the campers, and that this ordinance addressed only conduct on public property. *Id.* at 11-12. It therefore concluded that the initiative proposed "a classic vagrancy ordinance," which constituted a valid exercise of Spokane's police powers. *Id.* at 12 (citing 6A MCQUILLIN, *supra*, § 24:109, at 435 n.26 (3d ed. 2015)).

- (2) The initiative did not conflict with state law because state law, mainly chapter 43.185C RCW, does not "mandate or circumscribe adoption of any homelessness regulation." *Id.* at 12-13 (citing *Seattle Bldg. & Constr. Trades Council*, 94 Wn.2d 740, 747, 620 P.2d 82 (1980)). Instead, the court determined that the chapter deals mainly

---

[17] The Court of Appeals did not explain how deciding a case on the merits removes the preliminary question of appealability.

with data gathering and grant programs. *Id.* at 13 (citing RCW 43.185C.030-.060)

- (3) The initiative is legislative, not administrative, and thus permissible. *Id.* at 16. The court acknowledged that the initiative *could* be considered impermissibly administrative under prior controlling case law. *Id.* But it nevertheless concluded that the people's right to vote on local issues weighed in favor of calling the initiative legislative. *Id.* at 14-15 (citing *Spokane Entrepreneurial Ctr. v. Spokane Moves to Amend the Const.*, 185 Wn.2d 97, 108, 369 P.3d 140 (2016); *Our Water*, 170 Wn.2d at 12; *Heider*, 100 Wn.2d at 876; *Seattle Bldg.*, 94 Wn.2d at 746). The appellate court also held that Jewels had failed to carry its supposed substantial burden of proving that the initiative was impermissible. *Id.* at 15 (citing *1000 Friends of Wash. v. McFarland*, 159 Wn.2d 165, 183, 149 P.3d 616 (2006) (plurality opinion)).

*C. Washington Supreme Court Proceedings*

Jewels petitioned for review, asserting that the Hansen Initiative fell outside the local initiative power. Pet. for Rev. at 6-7. Hansen opposed review but petitioned for conditional review of the appealability of the superior court's order in the first place if we did grant Jewels' petition. Resp't Brian Hansen's (1) Answer to Pet. for Rev. & (2) Conditional Cross-Pet. for Rev. (Hansen's Answer & Conditional Cross-Pet.) at 3.

We granted review of both petitions.[18] Neither Spokane nor the county of

Spokane filed briefs in this court.[19]

ANALYSIS

I.      The trial court's decision holding that the Hansen Initiative falls within the
        permissible scope of the local initiative power is appealable

Hansen argues that the trial court's decision that his initiative falls within the

permissible scope of the local legislative power is not appealable. We disagree.

This is a question of statutory interpretation, so our review is de novo. *Skagit*

*County Pub. Hosp. Dist. No. 304 v. Skagit County Pub. Hosp. Dist. No. 1*, 177

Wn.2d 718, 723, 305 P.3d 1079 (2013) (citing *Dep't of Ecology v. Campbell &*

*Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)).

The initiative opponents cited three grounds for relief in the trial court: the

declaratory relief statute, the injunctive relief statute, and RCW 29A.68.011. RCW

29A.68.011 authorizes trial courts to order the entity in charge of an election to

correct an imminent ballot printing error for three reasons:

---

[18] Jewels filed an unopposed motion asking us to take judicial notice of several reports and plans on homelessness in Spokane and in Washington State, which we passed to the merits. We deny the motion; that information postdates the trial court proceedings in this case and is unnecessary for resolving this case.

[19] The American Civil Liberties Union of Washington, Greater Spokane Inc. and Downtown Spokane Partnership, and the Seattle/King County Coalition on Homelessness filed amici briefs.

> (1) An error or omission has occurred or is about to occur in printing the name of any candidate on official ballots; or

> (2) An error other than as provided in subsections (1) and (3) of this section has been committed or is about to be committed in printing the ballots; or

> (3) The name of any person has been or is about to be wrongfully placed upon the ballots.

None of those reasons apply to the initiative challenge in this case.

RCW 29A.68.011 does state that a challenge brought under that section "shall be heard and *finally disposed of* by the court not later than five days after the filing" of that affidavit. (Emphasis added.) We have held that this clear statutory language means that a trial court decision on a ballot challenge subject to RCW 29A.68.011 is generally "not appealable." *Parker v. Wyman*, 176 Wn.2d 212, 216, 289 P.3d 628 (2012) (affirming holding from .011's predecessor statute with "the same operative language" (citing *Hatfield v. Greco*, 87 Wn.2d 780, 781-82, 557 P.2d 340 (1976); *Kreidler v. Eikenberry*, 111 Wn.2d 828, 834, 766 P.2d 438 (1989))). There is a good reason for this: .011 challenges must be decided quickly "in order to settle the ballot in a reasonable time before the election." *Id.*[20]

---

[20] We decided the .011 challenge in *Parker* on the merits anyway—despite our holding on appealability. 176 Wn.2d at 217 (citing *State ex rel. Pennick v. Hall*, 26 Wn.2d 172, 173 P.2d 153 (1946), *overruled in part on other grounds by State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 413 P.2d 972 (1966)).

But the ballot challenge in this case is not subject to RCW 29A.68.011 or its bar on appealability. That statute provides a means for challenging three specific problems, all of which relate to ballot printing errors. RCW 29A.68.011(1)-(3) (referencing errors in ballot "printing" or wrongful placement of names on ballot). If a statute lists such specifics to which it applies, then we presume that the legislature meant the statute to apply only to those specifics. *See W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 611, 998 P.2d 884, 891 (2000) ("the mention of one thing implies the exclusion of others" (citing *State ex rel. Port of Seattle v. Dep't of Pub. Serv.*, 1 Wn.2d 102, 95 P.2d 1007 (1939))).

RCW 29A.68.011, with its nonappealability limit, thus does not apply to this case at all.

Instead, this claim for declaratory and injunctive relief concerning the scope of the local initiative power is more properly treated as one arising under RCW 29A.68.013. That statute allows a plaintiff to challenge errors by or negligence of election officers as well as "the certification of any measure" for the ballot. RCW 29A.68.013(1)-(3). It contains no bar on appealability. *Id.* Neither do the declaratory or injunctive relief statutes.[21]

---

[21] RCW 7.24.010 allows plaintiffs to file for declaratory relief; declaratory relief is appealable. RCW 7.24.070; *Purse Seine Vessel Owners Ass'n v. State*, 92 Wn. App. 381, 387, 966 P.2d 928 (1998) (citing *Wooh v. Home Ins. Co.*, 84 Wn. App. 781, 930 P.2d 337 (1997)). RCW 7.40.010 allows plaintiffs to file for injunctive relief; injunctive relief is appealable. *Greyhound Lines, Inc. v. City of Tacoma*, 81 Wn.2d 525, 527, 503 P.2d 117

Because RCW 29A.68.011 does not bar this appeal and because declaratory and injunctive relief are appealable, this case was properly appealed to the Court of Appeals and is properly before this court.

II.     The initiative falls outside the scope of the local initiative power because, under our precedent, it must be considered impermissibly administrative rather than permissibly legislative

*A.  Standard of review*

"Whether an initiative is beyond the scope of local initiative power is a question of law that we review de novo." *Protect Pub. Health v. Freed*, 192 Wn.2d 477, 482, 430 P.3d 640 (2018) (citing *Our Water*, 170 Wn.2d at 7).

Preelection review of direct citizen legislation like initiatives and referenda is generally disfavored, but we regularly review challenges to determine whether the issue addressed by that citizen legislation is "'proper for direct legislation'" or, in other words, whether the initiative is within the permissible scope of the local initiative power. *Malkasian*, 157 Wn.2d at 255 (quoting *Coppernoll v. Reed*, 155 Wn.2d 290, 299, 119 P.3d 318 (2005)).

The fact that the Hansen Initiative passed at the general election last November does not affect the nature of our review: "Postelection events do not

_____

(1972) (citing *State ex rel. Carroll v. Simmons*, 61 Wn.2d 146, 377 P.2d 421 (1962); *Lewis Pac. Dairymen's Ass'n v. Turner*, 50 Wn.2d 762, 314 P.2d 625 (1957); *Johnson v. Pate*, 54 Wn.2d 148, 338 P.2d 131 (1959)).

further sharpen the issues—the subject matter of the proposed measure is either proper for direct legislation or it is not." *Id.*

### B. General background on local initiatives

The local initiative power is more limited than the statewide initiative power. The Washington Constitution guarantees the right of the people to legislate directly by initiative or referendum on statewide issues. *Spokane Entrepreneurial*, 185 Wn.2d at 103-04 (citing WASH. CONST. art. II, § 1(a)). In contrast, "The right to file a *local* initiative is not granted in the constitution" and is instead secured by "state statutes governing the establishment of cities" that allow "cities to establish a local initiative process." *Id.* at 104 (citing RCW 35.22.200).

Thus, the state initiative power and the local initiative power "are not equivalent." *Freed*, 192 Wn.2d at 482 (citing *Coppernoll*, 155 Wn.2d at 301). Because a city *may* grant the local initiative power to its citizens, that power can be circumscribed—either by its own charter or by other statutory and constitutional limits. *Id.* at 482-83 (quoting *Spokane Entrepreneurial*, 185 Wn.2d at 107). The primary restriction on the local initiative power is that local initiatives can accomplish only what falls within the scope of their authorized power. *Id.*; *Our Water*, 170 Wn.2d at 8 (citing *Ruano*, 81 Wn.2d at 823).

From this restriction, we have held that a local initiative exceeds its proper scope if it (1) is "administrative" in nature instead of "legislative in nature" or (2)

affects issues delegated by the State to a local government's "legislative authority" rather than to the local government as a "municipal entity." *Freed*, 192 Wn.2d at 483 (citing RCW 36.40.080, .250; RCW 70.12.025), 487 (holding initiative invalid because it interfered with county council's State-delegated authority). For local initiatives, we have also asked whether the initiative covers a topic that the State has comprehensively legislated. *Our Water*, 170 Wn.2d at 15 (holding local initiative invalidly administrative because it "effectively reverse[d]" city's state-mandated water additive program). If the local initiative does cover such a topic, then it falls outside the scope of the local initiative power because state law grants localities the administrative power to implement state law, not the legislative power to reject state law. *Seattle Bldg.*, 94 Wn.2d at 748 (holding local initiative invalidly administrative because it barred construction of state facilities which "is not within the power of the City to do").

> C. *The test for determining whether a local initiative is permissibly legislative or impermissibly administrative*

We have adopted two tests for determining where an initiative falls on the impermissibly administrative versus permissibly legislative line:

- (1) "whether the subject is of a permanent and general character [legislative and permissible] or of temporary and special character [administrative and impermissible]" (the "permanent-temporary" test), and
- (2) "whether the proposition is one to make new law or declare a new policy [permissibly legislative], or merely to carry out and execute

> law or policy already in existence [impermissibly administrative]"
> (the "new law/execute law" test)

*Ruano*, 81 Wn.2d at 823-24 (citing *People v. City of Centralia*, 1 Ill. App. 2d 228,

117 N.E.2d 410 (1953); *Heider v. City of Wauwatosa*, 37 Wis. 2d 466, 155 N.W.2d

17 (1967); 5 MCQUILLIN, *supra*, § 16.55 (3d ed. rev. 1969)).

> *D. Under our precedent, the subject of the Hansen Initiative is impermissibly administrative*

As stated above, ch. 12.02 SMC regulates the use of public throughways and

waterways. In 2022, the Spokane City Council passed the *Martin* Ordinance,

overhauling ch. 12.02 SMC to comply with *Martin*. The *Martin* Ordinance added

several provisions that clearly targeted camping by homeless individuals. These

provisions barred public camping along Spokane's waterways and, most

importantly, provided a comprehensive scheme for punishing homeless camping

that accorded with *Martin*'s protections.

Under *Martin*, Spokane could criminalize and sweep homeless

encampments, but before doing so, law enforcement had to ensure that there was

shelter space available. The new SMC 12.02.1010 laid out the process for

complying with that rule by directing law enforcement officers to take several

steps before issuing criminal citations for public camping. These steps included

checking with local shelters on availability before issuing citations and providing

notice before sweeping any belongings. CP at 53-54 (citing SMC 12.02.1010(C)).

And the SMC still barred camping in certain areas regardless of shelter space,

including

 a. Underneath or within 50 feet of any railroad viaduct located within the Spokane Police Department's Downtown Precinct boundary as shown out in Exhibit A; and

 b. Within three blocks of any congregate shelter provided that signs are posted prohibiting camping that are clearly visible to pedestrians.

*Id.* at 53 (citing SMC 12.02.101(A)).

The Hansen Initiative took a different tack than the *Martin* Ordinance. It

added a new subsection (c) to subsection .101(A) forbidding camping regardless of

available shelter space:

 c. In public within one thousand (1,000) feet of the perimeter of the grounds of a park (SMC Section 12.06A.030(B&D)), a day care center or child care facility (RCW 35.63. 170(3-4)), or a public or private school (RCW 28A.150.010 and RCW 28A.195.010).

*Id.* at 30.[22]

---

[22] Hansen does not provide any argument as to the administrative or legislative nature of the initiative, believing Jewels has abandoned that argument. Hansen's Answer & Conditional Cross-Pet. at 12 n.3. But they have not abandoned that argument. They argued against the Court of Appeals' general determination that "the initiative was within the scope of the local initiative process." Pet. for Rev. at 3. We granted review of that issue and all the issues without reservation. Ord. Granting Rev. ("the petition for review and the conditional cross-petition for review are both granted"). That includes the Court of Appeals' conclusion that the initiative was legislative, not administrative. *Jewels*, 29 Wn. App. 2d at 16.

Under the permanent-temporary test, described in *Heider*, the Hansen Initiative is certainly a permanent change to the city code and, hence, could be considered legislative if that were the only test we needed to apply. 100 Wn.2d at 876.

But it is not the only test we need to apply. We need to apply the test that our cases say fits this situation. And the new law/execute law test, also described in *Heider*, directly addresses and rejects the type of initiative at issue here: an initiative that modifies details of an already enacted general policy scheme.

In *Heider*, Seattle had changed the name of a street from Empire Way to Martin Luther King Jr. Way. 100 Wn.2d at 875. Business owners on the street filed for a referendum to block the name change. *Id.* We held that the name change was an administrative act and therefore outside the proper scope of referendum by local initiative. *Id.* at 877.

We began with the rule that "'the referendum power extends only to matters legislative in character and not to merely administrative acts'" and we then applied both the permanent-general and new law/execute law tests (discussed above). *Heider*, 100 Wn.2d at 875-76 (quoting *Citizens for Financially Responsible Gov't v. City of Spokane*, 99 Wn.2d 339, 347, 662 P.2d 845 (1983)). Applying both tests, we determined that the permanent-general test was "of little assistance" because "a street name change" could be "permanent" but still not "general" and "special" but

still not "temporary." *Id.* at 876. We therefore turned to the new law-execute/law test, instead. We asked whether the referendum enacted a new policy (permissibly legislative) or affected an already existing local policy scheme (impermissibly administrative). *Id.* We concluded, "The name change ordinance merely amended Seattle's comprehensive street names ordinance. Therefore, the ordinance should be characterized as administrative, since it was enacted '[pursuant to] a plan already adopted by the legislative body itself.'" *Id.* at 875 (quoting 5 MCQUILLIN, *supra*, § 16.55, at 194).

The Hansen Initiative similarly amends Spokane's comprehensive homeless camping policy and previously enacted policy approach and implementing ordinance. Under *Heider*, the Spokane ordinance must be considered just as impermissibly administrative as the *Heider* referendum was.

We affirmed this approach in *Our Water*. In that case, we cited *Heider* and held that "a local government action is [impermissibly] administrative if it furthers (or hinders) a plan the local government or some power superior to it has previously adopted." 170 Wn.2d at 10. And we concluded that the fluoridation local initiative in *Our Water* failed for just that reason. *Id.* at 15.

The situation to which we applied that rule in *Our Water* is analogous to the situation presented by this case. In *Our Water*, the Port Angeles City Council voted to fluoridate the city's own municipal water system. *Id.* at 5. A citizen group filed

initiatives that criminalized putting such health additives (including fluoride) in the public water system. *Id.* at 6. The city sought declaratory relief that the initiative exceeded the scope of the local initiative power. *Id.* at 6-7. We agreed with the city. *Id.* at 5. We explained that "Port Angeles has operated its own municipal water system for nearly 100 years, and its own municipal code includes a fairly detailed regulatory scheme." *Id.* at 9-10. We then explained that the initiatives "explicitly seek to administer the details of the city's existing water system." *Id.* at 13. After describing how water fluoridation involves cooperation between multiple levels of government—city, state, and federal—in a detailed regulatory scheme, we held that the local initiatives were impermissibly administrative because they interfered with and "effectively reverse[d]" the implementation of the city's water program adopted under long-standing city and state policy decisions and regulatory regimes. *Id.* at 15.

The Hansen Initiative similarly interferes with and effectively reverses Spokane's comprehensive homeless camping policy adopted under city and state policy decisions and regulatory schemes. Under *Our Water*, the Spokane ordinance must be considered just as impermissibly administrative as the Port Angeles antifluoridation initiative was.

In sum, the comprehensive municipal policy scheme in *Heider* regulated street names. 100 Wn.2d at 875-76. The comprehensive state/municipal policy

scheme in *Our Water* regulated water additives and fluoridation. 170 Wn.2d at 15. In this case, the comprehensive municipal policy scheme regulates public camping, including homeless encampments. This municipal policy scheme, no less than the *Heider* and *Our Water* municipal policy schemes, establishes a broad policy of state-local engagement and interchange that balances constitutional protections with the city's health and safety. The Hansen Initiative upsets this careful balance by implementing "never-camp" zones. CP at 67 ("We have looked at the maps and the Initiative would leave only a small area in which encampments could occur, if any."). Under our binding precedent cited above, Spokane's Hansen Initiative is just as impermissibly administrative as Port Angeles's fluoridation initiative and Seattle's street names initiative.

That means that Spokane's Hansen Initiative falls outside the scope of the local initiative power. Rather than creating a new legislative policy, it tinkers with the administration of a previously adopted plan and "hinders[] [that] plan [that] the local government or some power superior to it has previously adopted." *Our Water*, 170 Wn.2d at 10; *Heider*, 100 Wn.2d at 876; *Leonard v. City of Bothell*, 87 Wn.2d 847, 851-52, 557 P.2d 1306 (1976)*; Ruano*, 81 Wn.2d at 825.

E.  *The Court of Appeals' contrary conclusion strayed from de novo review*

The Court of Appeals agreed that this was a difficult issue, and it came to a different conclusion. It rested its contrary conclusion in part on its decision that the

31

*Heider/Our Water* tests for determining whether an initiative is impermissibly administrative or permissibly legislative apply only to "the details of a 'highly regulated' public utility or program," and Spokane's homelessness policy did not fall into that "highly regulated" category. *Jewels*, 29 Wn. App. 2d at 15 (citing *Our Water*, 170 Wn.2d at 12; *Spokane Entrepreneurial*, 185 Wn.2d at 108).

We disagree with that conclusion. SMC 12.02.1010—enacted by the *Martin* Ordinance—is a very "highly regulated" program (as the length of that quoted ordinance, *supra* at 8-11, suggests): it lays out a detailed enforcement scheme carefully crafted to comply with *Martin*. It generally bans public camping. SMC 12.02.1010(A)(1). It provides an exception to that general ban "at a time when there is no available overnight shelter." SMC 12.02.1010(C)(1). It details multiple steps law enforcement must take before issuing criminal citations. SMC 12.02.1010(C)(1)(a)-(b). And it has specific public-safety exceptions to the shelter rule. 12.02.1010(A)(2)(a)-(c). It also has small-radius "never-camp" zones around specific pieces of public infrastructure. SMC 12.02.1010(A)(3)(a) (barring camping "[u]nderneath or within 50 feet of any railroad viaduct . . . within the Spokane Police . . . Downtown Precinct boundary"), (b) (barring camping "[w]ithin three blocks of any congregate shelter provided that signs are posted" and "clearly visible"). In other words, it provides just as much of a detailed

regulatory scheme implementing tough policy choices as did the ordinances addressed in *Heider* and *Our Water*.

The Court of Appeals also came to a different conclusion in part because it concluded that doubts about whether a local initiative is administrative or legislative should be resolved in favor of calling it legislative so the people could vote on it. *Jewels*, 29 Wn. App. 2d at 15. The Court of Appeals used "two guiding principles" to form this test: it gave great weight to "the right to vote on initiatives and referenda" and it placed the "burden of proof" on Jewels to show that the initiative was invalid. *Id.* (citing *Seattle Bldg.*, 94 Wn.2d at 746; *1000 Friends*, 159 Wn.2d at 183).

We certainly agree that the right to vote is critically important—that's why "we strictly limit the type of preelection challenges courts will review." *Spokane Entrepreneurial*, 185 Wn.2d at 104.

But we disagree with the Court of Appeals' decision to place a "burden of proof" on Jewels to show that the initiative was invalid.

The "burden of proof" typically refers to an evidentiary matter in a case with disputed facts. The Court of Appeals acknowledged this. *Jewels*, 29 Wn. App. 2d at 15 n.7 ("when a litigant challenges the legality of a statute, the litigant has also been assigned a burden of proof" (citing *State v. Halstien*, 122 Wn.2d 109, 118, 857 P.2d 270 (1993))).

But there are no disputed facts in this preelection challenge. The Court of Appeals, like this court, was dealing with a purely legal question: whether the Hansen Initiative, as written, fell within the permissible scope of the local initiative power. There is no "burden of proof" on a legal issue like this. Instead, as discussed at the beginning of this section, reviewing courts must apply de novo review to this legal issue.

As we have explained, "de novo" means de novo—without a thumb on the scales for one side or the other depending on the facts. Even when evaluating a constitutional challenge to an already enacted statute, where we have in the past stated that the challenger bears the burden of proof, we were not using the words "burden of proof" in their factual, trial court, evidentiary sense. *Quinn v. State*, 1 Wn.3d 453, 470-71, 526 P.3d 1 (2023) (citing *Belas v. Kiga*, 135 Wn.2d 913, 919-20, 959 P.2d 1037 (1998)). As we have explicitly clarified, we used that phrase "*not* [*as*] *an evidentiary standard* but [as] a reflection of 'respect for the legislature.'" *Id.* at 471 n.9 (emphasis added) (quoting *Sch. Dists.' All. for Adequate Funding of Special Educ. v. State*, 170 Wn.2d 599, 606, 244 P.3d 1 (2010)).

De novo review, though, remains de novo.

We therefore reiterate that on de novo review, the Hansen Initiative is impermissibly administrative rather than permissibly legislative under the definitions of "administrative" and "legislative" in our controlling precedent.

CONCLUSION

We hold that Jewels had the right to appeal the trial court's decision on the validity of the Hansen Initiative under RCW 29A.68.013 as well as the statutes governing declaratory and injunctive relief.

We further hold that the Hansen Initiative falls outside the scope of the local initiative power because it is impermissibly "administrative" rather than permissibly "legislative" under our controlling precedent defining those terms in this context.

_____
Gordon McCloud, J.

WE CONCUR:

_____          _____
                                                    Yu, J.

_____          _____
Johnson, J.

_____          _____
Madsen, J.

_____          _____
González, J.                                        Mann, J.P.T.

No. 102814-8

STEPHENS, C.J. (dissenting)—A Spokane citizen filed, and the people of Spokane passed, an initiative (Hansen Initiative) banning camping on public land within 1,000 feet of Spokane's schools, parks, and licensed day care facilities. The majority holds that the Hansen Initiative exceeds the scope of the local initiative power because it is impermissibly administrative rather than legislative. To support this conclusion, the majority asserts that the Hansen Initiative interferes with Spokane's "comprehensive scheme for punishing homeless camping" established by the "*Martin* Ordinance," enacted by the city council in 2022. Majority at 26. I believe the majority misinterprets what makes a regulatory scheme "comprehensive" and what makes an initiative "administrative," resulting in a significant narrowing of the people's power to pass initiatives that depart from the policy choices made by their local legislative body. For this reason, I respectfully dissent.

ANALYSIS

Spokane's authority to enact public camping laws is derived from article XI, section 11 of the Washington State Constitution, which provides that "[a]ny county, city, town or township may make and enforce within its limits all such local police,

1

sanitary and other regulations as are not in conflict with general laws." In charter cities such as Spokane, the legislative power to enact such laws generally rests with the mayor and city council. RCW 35.22.200. However, cities may also authorize direct legislation by the people. *Id.* Spokane's city charter grants this right, stating, "The people of Spokane in regard to local legislative matters shall have the power of direct legislation by initiative and referendum." CITY OF SPOKANE CHARTER art. IX, § 81. The charter bolsters the breadth of this power when it provides that all power exercised by the mayor and city council "shall be subject to the control and direction of the people at all times by the initiative [and] referendum." *Id.*, art. I, § 4.

This power is not without limits. A local initiative must concern topics that are legislative in nature, rather than administrative, and we have recognized that this distinction is not always clear. *City of Port Angeles v. Our Water-Our Choice!,* 170 Wn.2d 1, 10, 239 P.3d 589 (2010). Generally, an initiative is considered impermissibly administrative if it "furthers (or hinders) a plan the local government or some power superior to it has previously adopted." *Id.* It is also administrative if it merely carries out or executes law or policy already in existence. *Id.* Conversely, an action is legislative when it makes new law or declares new policy. *Id.* In determining which category an initiative falls into, a court must examine not only the nature of the initiative itself but also the legal framework in which the action

2

occurs. *Glob. Neigh. v. Respect Wash.*, 7 Wn. App. 2d 354, 395, 434 P.3d 1024 (2019).

The majority relies on two cases—*Heider v. City of Seattle*, 100 Wn.2d 874, 675 P.2d 597 (1984), and *Our Water*—to conclude that the initiative is administrative. However, both of these cases concerned initiatives that are fundamentally different from the one at issue here.

In *Heider*, the Seattle City Council amended the city's "comprehensive street names ordinance," by passing Ordinance 110692, which renamed Empire Way to Martin Luther King Jr. Way. 100 Wn.2d at 875. Business owners attempted to challenge the name change through a referendum election. *Id.* The court held that the referendum repealing the name change exceeded the scope of the people's legislative power because the ordinance was administrative in nature. *Id.* at 877. The court reasoned that the new ordinance was enacted "'[pursuant to] a plan already adopted by the legislative body,'" and therefore it "merely amended Seattle's comprehensive street names ordinance." *Id.* at 876 (alteration in original) (quoting 5 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 16.55, at 194 (3d rev. ed. 1981)).

To understand the legislative-administrative distinction drawn in *Heider*, it is helpful to examine why the original street names ordinance might be described as

"comprehensive." *Id.* at 877. Adopted by the city in 1974, the 63-page ordinance began with this statement: "An ordinance changing, confirming and establishing the names of *all public streets* and certain other ways within the City and establishing a grid system in connection therewith and superseding all prior ordinances relating to street names." SEATTLE ORDINANCE 102981 (Jan. 29, 1974) (emphasis added) https://clerk.seattle.gov/~archives/Ordinances/Ord_102981.pdf [https://perma.cc/76SC-6YJ3]. The ordinance then provided a complete list of every street name in Seattle, accompanied by detailed maps indicating their locations. *Id.* Eight years later, the Seattle City Council unanimously passed an ordinance to change just one of those street names. *Heider*, 100 Wn.2d at 875. This name changing ordinance did not establish a new street name policy or plan but rather modified an existing one. For that reason, the court concluded it was administrative in nature and therefore immune from referendum. *Id.* at 877.

In reaching its decision, the *Heider* court relied on *Leonard v. City of Bothell*, 87 Wn.2d 847, 557 P.2d 1306 (1976), which examined whether a municipal ordinance rezoning an area of the city from agricultural to commercial was subject to a referendum. *Id.* at 848. The *Leonard* court concluded that it was not, reasoning that while the initial adoption of a city's zoning code and "comprehensive plan" is a legislative function, subsequent amendments that implement or refine that plan are

4

administrative. *Id.* at 851. Of particular importance to the decision was the fact that

zoning decisions require expertise. The court observed:

> Amendments to the zoning code or rezone decisions require an informed and intelligent choice by individuals who possess the expertise to consider the total economic, social, and physical characteristics of the community. . . . SEPA [State Environmental Policy Act of 1971] requires a sophisticated understanding of the environmental problems of the project.

*Id.* at 854. The court also recognized that a referendum could "'wholly destroy[]'"

the "'uniformity required in the proper administration of a zoning ordinance.'" *Id.*

(quoting *Kelley v. John*, 162 Neb. 319, 323, 75 N.W.2d 713 (1956), *overruled in*

*part on other grounds by Copple v. Lincoln*, 210 Neb. 504, 315 N.W.2d 628 (1982)).

The *Heider* court found the zoning code in *Leonard* and the street naming ordinance

to be comparable. 100 Wn.2d at 877. Drawing on these similarities, the court

concluded that just as an amendment to a zoning code is an administrative act, so

too is an ordinance changing a street name.

The majority asserts that like in *Heider*, "[t]he Hansen Initiative similarly

amends Spokane's comprehensive homeless camping policy and previously enacted

policy approach and implementing ordinance." Majority at 28-29. However, the

two laws are completely different. The name changing ordinance, and the

referendum seeking to reverse it, concerned a change to one street name of the more

than 2,000 listed in the original ordinance. Neither attempted to change the overall municipal policy toward street naming.

The Hansen Initiative, on the other hand, does not simply amend one small provision of the *Martin* Ordinance or direct an action pursuant to an existing policy on public camping or homelessness. Instead, it represents a significant shift in the core policy expressed by the ordinance. The majority acknowledges this, observing that the Hansen Initiative "*greatly expanded* Spokane's criminalization of camping" and "effectively *reverses* Spokane's comprehensive homeless camping *policy*." Majority at 13, 30 (emphasis added). The majority further recognizes that the initiative "would leave only a small area in which encampments could occur, if any." *Id.* at 30. This is not a minor administrative adjustment to an existing policy—it is a fundamental policy shift.

The majority also tries to equate the *Martin* Ordinance to the "detailed regulatory scheme" at issue in *Our Water.* *Id.* at 29. In that case, the court considered whether two initiatives seeking to repeal a city council decision to fluoridate public water fell within the local initiative power. The court held no, concluding that the initiatives were administrative because they "explicitly [sought] to administer the details of the city's existing water system." *Our Water*, 170 Wn.2d at 13. The court emphasized that fluoridation regulations operate under a "fairly

detailed regulatory scheme," codified in multiple sections of the municipal city code. *Id.* at 9, 15; *see* chs. 13.24-.48 PORT ANGELES MUNICIPAL CODE. In addition, the court noted that water quality must also comply with state and federal regulations, which the court found were specifically impacted by the citizens' initiatives. *Our Water*, 170 Wn.2d at 15. As a result, the court determined that local initiatives seeking to change one aspect of this highly regulated scheme were administrative and beyond the scope of the local initiative power. *Id*.

The majority insists that the *Martin* Ordinance "provides just as much of a detailed regulatory scheme implementing tough policy choices as did the ordinances addressed in . . . *Our Water*." Majority at 32. As support, the majority cites to the length of the ordinance and its level of detail in defining the procedures for enforcement. *Id.* at 31-32. This analysis misinterprets what the *Our Water* court considered to be the key factor. It was not the length or level of detail in the city's municipal code regulating its public water system that created the highly regulated scheme but, rather, the fact that water quality is "highly regulated" by intersecting city, state, and federal laws. *Our Water*, 170 Wn.2d at 4 ("Public drinking water quality is highly regulated by the United States and Washington State governments. Extensive regulations dictate what may and may not appear in the water.").

7

The problem with the Port Angeles citizens' initiatives is that they sought to repeal the city council's action in order to "set limits on the amount of fluoride that can be present in the water" and "import[] testing and documentation standards . . . into the public water regime." *Id.* at 14. The court found these initiatives to be administrative not merely because they altered an existing municipal regulation but because they impacted a highly regulated area of law, subject to extensive oversight by multiple levels of government. It was this highly regulated area of law, not the level of detail in the city's municipal code, that led the court to conclude that the initiatives were outside the people's power to enact.

Public camping, by contrast, is not a highly regulated area of governance. The majority asserts that the Hansen Initiative interferes with "Spokane's comprehensive homeless camping policy adopted under city and state policy decisions and regulatory schemes." Majority at 30. However, the *Martin* Ordinance was not adopted under city and state regulatory schemes. It simply reflects local policy. The state Homeless Housing and Assistance Act is a program designed to fund services and prevent homelessness generally, and it says nothing about public camping; and even if it did, the program is voluntary for county and city governments. RCW 43.185C.080. Similarly, the city's five-year strategic plan to end homelessness does not concern the legality or enforcement of unauthorized public camping. While the majority correctly notes that Spokane's five-year plan

8

addresses encampments, it does so in the context of expanding street outreach and enhancing targeted services, not in regulating or enforcing public camping laws. *See* CP at 339 (Section 2.2.6. Encampments); majority at 5.

The *Martin* Ordinance is a stand-alone legislative action by the Spokane City Council to preserve public lands through the criminalization of public camping. It did not modify or implement a component of a broader plan like in *Heider* nor concern an overtly technical area of expertise like in *Leonard*. Instead, the ordinance falls squarely within the city's exercise of the police power to, among other things, mete out criminal punishment for unauthorized camping on public property. "The scope of [a municipality's] police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people." *State v. City of Seattle*, 94 Wn.2d 162, 165, 615 P.2d 461 (1980). The Spokane city charter expressly empowers its residents to make and enforce laws on all matters legislative in nature, thereby directly exercising the police power. The *Martin* Ordinance and the Hansen Initiative both reflect policy decisions prohibiting camping on any public property while limiting enforcement in certain areas. The Hansen Initiative moves the public policy in a different direction, expanding the locations where the prohibition on public camping may always be enforced, to include certain areas close to where children gather. This is a not a technical or a minor administrative adjustment within an existing comprehensive policy. The

9

initiative embodies a new policy decision, the wisdom or constitutionality of which is not before us.

## CONCLUSION

It is well within the local initiative power for the people of Spokane to pass measures that take a different policy direction from the legislative enactments of the city council, such as the *Martin* Ordinance. The majority errs by characterizing the Hansen Initiative as administrative and defining "administrative" so broadly that it effectively eliminates the local initiative power altogether.

I would affirm the decisions of the Court of Appeals, superior court, and hearing examiner, all of which correctly found the Hansen Initiative to be legislative in nature and therefore within the people's local initiative power. I respectfully dissent.

_____
Stephens, C.J.

_____
Whitener, J.

10